# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
November 24, 2009 Session

## STATE OF TENNESSEE v. MARVIN J. HILL

### Appeal from the Criminal Court for Knox County
### No. 84920      Richard Baumgartner, Judge

---

### No. E2008-02210-CCA-R3-CD - Filed May 12, 2010

---

A Knox County Criminal Court jury convicted the defendant, Marvin J. Hill, of first degree premeditated murder, *see* T.C.A. § 39-13-202 (2003), and abuse of a corpse, *see id.* § 39-17-312. The trial court imposed sentences of life imprisonment and six years, respectively, and ordered the sentences to be served concurrently for an effective sentence of life in prison. In this appeal, the defendant argues that the trial court should have suppressed bodily fluids obtained from the victim's body as fruit of the defendant's unconstitutionally procured statement, contends that the trial court erred by admitting into evidence telephone calls the defendant placed while in jail and a videotape recording of the victim's body being recovered by authorities, asserts that the trial court should not have ruled that he could be impeached by convictions greater than 10 years old, claims that the trial court erred by permitting the State to argue that the victim had been raped prior to her death, and challenges the sufficiency of the convicting evidence. Discerning no error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Mark E. Stephens, District Public Defender, for the appellant, Marvin J. Hill.

Robert E. Cooper, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

On May 29, 2006, the defendant killed the victim, 28-year-old Christina Eubanks, in her apartment in the Fort Sanders area of Knoxville. In addition to beating the victim with a toilet tank lid, the defendant fastened a dog leash around the victim's neck and strangled her before wrapping her body in a sheet and an area rug and placing it in his car. He then drove the body to a small concrete bridge near the intersection of Jim Sterchi Road and Dry Gap Pike, where he dumped the victim's body into a creek.

At trial, the victim's best friend, Jessica Truax, testified that after receiving a telephone call from her boyfriend, she went to the victim's apartment sometime after 5:30 p.m. on May 31, 2006, to see if the victim was home. She recalled that the victim would not answer her mobile telephone and had not arrived for work as scheduled. Ms. Truax testified that the victim did not answer the door and had not been seen by friends or neighbors for a couple of days. Ms. Truax stated that she and a neighbor opened the side window to the victim's apartment and heard the victim's dog barking and the victim's mobile telephone ringing. The victim's neighbor, Bill, climbed in through the window and unlocked the front door. Ms. Truax recalled that the victim was not inside the apartment and that the dog had been locked in the victim's bedroom without food or water. She said there was dog feces on the floor, which she described as very unlike the dog. Ms. Truax testified that it was uncharacteristic of the victim to leave the dog alone without arranging for someone to care for him in her absence. Ms. Truax described the appearance of the victim's bedroom for the jury: "Her bedroom was very - - like the stuff was scattered all over. Her sheets were thrown to the side of the bed and hanging over the side of the bed, and there was just random items like all against the wall on the side of the bedroom that . . . was out of the norm." Ms. Truax recalled seeing the victim's glasses on a bedside table, which she thought was unusual because the victim had very poor vision and did not go anywhere without her glasses. In addition to the glasses, the victim's purse, keys, and mobile telephone had also been left behind. Ms. Truax stated that a couch and coffee table appeared to have been moved, that a dog leash was missing from its hook near the door, and that "[t]he toilet in the bathroom was missing a lid." Based on these observations, Ms. Truax called 9-1-1. She said she saw "porcelain chips" inside the apartment and pointed them out to investigators.

During cross-examination, Ms. Truax admitted that the victim used marijuana and that she and the victim had smoked marijuana together. She conceded that she lied to police when they asked if the victim used drugs.

Dustin Trukken, the victim's next door neighbor, testified that he knew the victim but that he "[n]ever really hung out with her." Mr. Trukken stated that he also knew defendant and that he had smoked marijuana with the defendant. He recalled that as he

walked back to his house in the early morning hours of May 30, 2006, he saw the defendant drive up outside the victim's apartment. He stated that he and the defendant spoke briefly before they walked together to Sam's Party Store, which was closed. Mr. Trukken testified that the defendant told him that "he was helping [the victim's] boyfriend move out." He recalled that the defendant left Sam's Party Store before he did, and when he walked home a short time later he saw the defendant outside the victim's apartment "laying down in the back seat of his car." He said that the door to the victim's apartment was open and that the defendant told him the victim's boyfriend had called and asked the defendant to get his stuff from the victim's apartment.

Mr. Trukken admitted that he had been drinking alcohol and smoking marijuana "the whole night" so that he "wasn't in the clearest state of mind" when he encountered the defendant. He described the defendant's demeanor as "somewhat shaky" and "a little upset," but he said the defendant's behavior was "not anything that really alarmed [him] or anything else that made [him] know anything was going on." Mr. Trukken stated that when he learned the victim was missing, he telephoned police and reported his observations to Officer Travis Brasfield.

The victim's boyfriend, Sean Maynard, who was living in Wilmington, Delaware, at the time of the victim's death, testified that he spoke with the victim by telephone early on the morning of May 29, 2006, and she told him that "she was not going to work that day [be]cause her wrist was hurting." He explained that the victim had carpal tunnel syndrome in her right hand that caused her to experience "severe pain from punching the cash register at work, and she would wear a brace on that hand." Mr. Maynard recalled that he talked to the victim three more times that day, with the last time being "before [they] both went to bed which would be somewhere between 10 and 11." When he could not reach the victim by telephone on Tuesday or Wednesday, he became concerned and called Jonathan Bolter, who was Jessica Truax's boyfriend. Mr. Maynard stated that he eventually called the defendant, a mutual friend, because he "was desperate" to find out whether "anyone had seen her in the last day or so." He recalled that the defendant told him "that he had not seen her, and that if he did see her" he would call Mr. Maynard.

Mr. Maynard testified that he first met the defendant when they worked together at the Fresh Market in 2002. He stated that although the victim also worked at the Fresh Market, he did not believe that they knew each other at that time. Mr. Maynard said that he and the victim began dating in 2004 and that he introduced the defendant and the victim. He recalled that the three of them visited with each other at the victim's apartment and that they "would all smoke marijuana together." He stated that he moved to Wilmington in November 2005, but he continued to date the victim and visited her once or twice a month. Mr. Maynard testified that during his visits, the defendant would come to the victim's

apartment so that they could smoke marijuana.

Mr. Maynard described his relationship with the victim as "mutually exclusive." Describing the victim's relationship with the defendant he said, "I wouldn't say that it was close, just that they were friends." He stated that he did not believe from observing their interaction that the victim and the defendant were engaged in a sexual relationship. Mr. Maynard testified that the victim routinely removed her wrist brace before they engaged in sexual intercourse. He said that the victim had never locked her dog in the bedroom.

During cross-examination, Mr. Maynard stated that he and the victim had been to the defendant's residence and that they had traveled with the defendant and his wife, Robin Hill, to Kentucky to play bingo. He testified that he sometimes paid the defendant for the marijuana that they smoked with the victim and that the defendant sometimes provided it at no charge.

Timothy Marshall testified that he lived near the victim and that he knew the defendant through "an old roommate" who had worked with the defendant at the Fresh Market. Mr. Marshall stated that he and the defendant smoked marijuana together. Mr. Marshall testified that the defendant left him a voice mail message on June 1, 2006, asking that Mr. Marshall call him as soon as possible. Mr. Marshall stated that when he returned the defendant's telephone call, the defendant asked him "to deliver a message to . . . Dustin Trukken." Mr. Marshall testified, "He told me to tell Dustin that Dustin didn't know him, Dustin didn't see him. . . . He said it was a matter of life or death. He couldn't tell me right now. He'd tell me at a later time, and that was it. I delivered the message."

During cross-examination, Mr. Marshall again admitted using marijuana with the defendant, but he denied selling drugs to the defendant. He also conceded that he asked Knoxville Police Department Investigator Travis Brasfield not to go to his apartment. He explained, "At the time my roommates were freaked out by the thought of cops coming to the house." He stated that he also asked Officer Brasfield to stay away from his apartment because there were drugs in the residence.

Knoxville Police Department ("KPD") Investigator Travis Brasfield, who responded to the missing person's call at the victim's apartment, testified that when he entered the apartment he "noticed some blood on the floor on the vinyl[] and . . . noticed some blood stains in the living room on the carpet." He also observed that there was "no tank lid on the toilet." He stated that he also saw "some white chips out on the sidewalk" that "looked a little strange." After interviewing Mr. Marshall and Mr. Trukken, Officer Brasfield obtained a search warrant for the defendant's Toyota RAV4, which he located at

-4-

the defendant's residence on Rifle Range Road. He stated that he had the vehicle towed to the "crime lab processing bay." After testing indicated the presence of blood in the back seat area of the defendant's vehicle, Officer Brasfield returned to the defendant's residence to speak with the defendant's wife, and she gave him "some x-ray photos, some doctor's papers for a medical clinic, some clothes, and a photograph of the defendant."

Officer Brasfield testified that the defendant was arrested on June 3, 2006. At that time he had "minor scratch marks on his face" and a bite mark on his hand. He recalled that officers confiscated the defendant's mobile telephone and that the victim's mobile telephone number was listed in the contacts.

During cross-examination, Officer Brasfield testified that the victim's apartment showed no signs of a struggle. He also confirmed that officers found a pair of sweat pants next to the television in the living room of the victim's apartment.

KPD Forensics Officer Ed Johnson testified that crime scene technicians photographed the victim's apartment and collected swabs from blood stains on the floor and wall, from a "vibrator" and a "ribbed rubber device" found in the victim's bedroom, from a vodka bottle, and from a water bottle.

KPD Forensics Officer Daniel Crenshaw, who collected evidence from defendant's vehicle, testified that he found a stun gun in the console and some cleaner called "Spot Shot." He testified that he sprayed the interior of the vehicle with "Blue Star," which he described as "a presumptive blood reactant." He stated that Blue Star will reveal the presence of blood "[e]ven after it's been diluted or cleaned, it can show diluted blood up to 1 in 10,000 parts. So the manufacturer claims. So, in essence, it'll show blood even when it's not visible to the human eye after it's been cleaned." He recalled that the application of Blue Star indicated blood in "the rear passenger area of the vehicle[] and also on a flashlight in the front door pocket." Officer Crenshaw collected swabs from these areas, explaining, "One thing about the Blue Star, it doesn't degrade the DNA in blood. So you can test it later for DNA."[1] Carpet from the rear passenger area of the defendant's vehicle was later cut and sent for DNA testing.

KPD Forensics Officer Gerald Smith, who assisted in the recovery of the victim's body on June 3, 2006, testified that the victim's body was eventually found in a creek "just below [a] small one-lane bridge" near the intersection of Jim Sterchi Road and Dry Gap Pike. He testified,

---

[1]deoxyribonucleic acid

The Knoxville Fire Department hazardous materials team was called in to assist with the recovery of the body. They had to cut away some of the treeline there so that we could get down to it . . . and they actually suited up the HAZMAT team to go down and assist with the recovery of the body.

Officer Smith said authorities also found a yellow bed sheet "hanging in the trees just to the left of her body," a pillowcase, "a large area rug, a blue tablecloth[,] and another smaller area rug." He also recalled that they found "some pieces of a porcelain toilet tank top" on the concrete bridge and underneath the victim's body.

Officer Smith testified that authorities later found "a white porcelain tank top, had a broken corner on it, observed a blood smear on that tank top, a blue T-shirt, a fitted gold and blue striped sheet, and a multicolored patched quilt with blood stains" in a dumpster in Fountain City. During cross-examination, Officer Smith conceded that he had no idea of the relevancy of any of the items other than the toilet tank lid.

KPD Violent Crimes Investigator Andrew Boatman testified that he listened to telephone conversations between the defendant and various members of the defendant's family that were recorded while the defendant was in jail. Several recordings were played for the jury. In addition, Officer Boatman testified that the defendant discussed many of the details of the offense with his family members, including admitting that he hit the victim with "[a] toilet tank lid," that "the first hit was different than the other hits," and that the lid broke while he was hitting the victim. Officer Boatman recalled that the defendant also said that he "tried to revive" the victim with a stun gun and that "he used [the dog chain] to drag her." Officer Boatman stated that the defendant told his wife that he and the victim had had sexual intercourse on one occasion and that "it wasn't any fun."

Acting Knox County Chief Medical Examiner Doctor Darinka Mileusnic-Polchan testified that former Knox County Chief Medical Examiner Doctor Sandra Elkins performed the autopsy of the victim and that she had reviewed Doctor Elkins's autopsy report. She stated that when the victim's body arrived at the medical examiner's office, it was in a "moderately advanced stage of decomposition" and that "[t]he epidermis was detaching and falling off the body." In addition, "the skin was already turning a purple with a lot of marbling of the skin . . . , and there was a lot of kind of deformity of the facial features because of the gaseous transformation which is part of decomposition of the body." Doctor Mileusnic-Polchan testified that the victim's body arrived clothed in only a shirt. Describing the process to distinguish bruises on the victim's body from artifacts of her decomposition, Doctor Mileusnic-Polchan explained,

[T]he best thing to do at the time of the autopsy to show whether it's contusion or abrasion or artifact, if they're unsure sometimes in badly [de]composed bodies, to take a section of the tissue, and then we mount it on the slide and look under the microscope to see if there is hemorrhage in the tissue, meaning it's true contusion, true injury.

Doctor Mileusnic-Polchan testified that "multiple clustered bruises or contusions on the back of . . . both hands" were "consistent with defensive injuries as opposed to [the victim's] hitting somebody and injuring her knuckles." She described the contusions on the victim's right leg as "clustered due to blows from . . . an object." The right side of the victim's face was essentially covered with a large contusion that extended from her right ear to the chin and over to her mouth and nose. The left side of the victim's face "suffered much more injury than the right side of the face. The whole area . . . is just . . . huge contusion." Doctor Mileusnic-Polchan testified that "[i]n addition to the bruising" on the left side of the victim's face there were "two lacerations. Again, lacerations, we have the break in the integrity of the skin." She stated that Doctor Elkins located two more lacerations, with the longest being three inches long, behind the victim's left ear. "Because of the blows to the head, there were injuries to the skull, the bone, and the brain itself." "There was a fracture that was in the general area of the largest laceration . . . on the back of the head . . . . that was branching in both directions and toward the base of the skull." She added that "[t]he brain itself was surrounded by hemorrhage" and that the type of hemorrhage indicated a "kind of crushing of the brain itself."

Doctor Mileusnic-Polchan testified that "ligature abrasions that were correspondent to the dog leash" around the victim's neck; petechiae, "fine pinpoint lesions in the skin" that are "a frequent finding in strangulations," on the victim's scalp; and contusions on the victim's neck were consistent with "horizontal" strangulation. Doctor Mileusnic-Polchan stated that because there was no crushing injury to the victim's neck, the strangulation in this case would indicate a "slow death." She testified that the injuries to the victim's neck were "consistent with her being alive when the strangulation occurred, not just with her being dead and dragged to a certain location." She could not tell, however, whether the victim lost consciousness before being strangled.

Doctor Mileusnic-Polchan stated, "I can say with certainty that she was not hit, fell, and then hit the ground and that's what killed her. I can tell with certainty that the direct blow killed her." She added, "[O]ne of the important things for the injury on the head that I described is that they are toward the back of the head. So she was not facing the assailant directly. She was turned . . . ." According to Doctor Mileusnic-Polchan, the laceration to the back of the victim's head would be consistent with the victim's being struck by a broken

toilet tank lid. She opined that "the fractured skull and the crushing injury of the brain" was "more consistent" with the victim's being on the ground rather than standing when she received some of the blows. Doctor Mileusnic-Polchan testified that because there was no pattern to the bruising on the victim's face, the injury could have resulted from "multiple fist blows" or a "large object blow." She stated that the condition of the brain cells indicated that it took "a while" for the victim to die after suffering the initial blow. In addition, she testified that fluid accumulation and the presence of aspirated material in the victim's lungs indicated that "she was alive and she was breathing in whatever was around her from the environment, . . . from the water from the creek."

According to Doctor Mileusnic-Polchan, although the presence of semen in the victim's vaginal vault confirmed that she had engaged in sexual intercourse, Doctor Mileusnic-Polchan could not tell whether the sex was consensual or whether the victim was conscious during the act.

Ashlee Fulmer, a supervisor and senior DNA analyst at Bode's Technology in Martin, Virginia,[2] testified that the vaginal swabs taken from the victim's body tested positive for the presence of semen and that the DNA isolated on the swabs "matched the profile that was obtained from the reference standard provided from Marvin J. Hill." She stated that swabs from the "interior rear passenger door, rear passenger floor at door, swabs from flashlight, rear passenger seat back, back of front passenger seat," all taken from the defendant's RAV4, were negative for the presence of blood. She testified that carpet cuttings from the interior of the defendant's vehicle, however, tested positive for the presence of blood and that DNA testing confirmed that the blood "contained the victim's profile." She recalled that swabs from the carpet in the victim's living room and floor in the foyer tested positive for blood as did "swabs from [the] red stain on [the] east wall behind [the] lamp." The swab from the living room carpet contained the victim's blood, but the "[s]wabs from [the] red stain on [the] east wall behind [the] lamp contained a male profile" that was not the defendant's. The vibrator taken from the victim's bedroom tested positive for the presence of semen, but the "sperm fraction" from the swab of the vibrator failed to yield a profile while the "non-sperm fraction" contained the victim's profile. Ms. Fulmer testified that the "non-sperm fraction of the ribbed rubber device contained a partial mixed profile that included alleles that [we]re consistent" with the victim's profile. She recalled that swabs from the water bottle and coffee mug contained the victim's profile.

During cross-examination, Ms. Fulmer confirmed that the defendant's DNA was not found on any of the samples taken from inside the victim's apartment and that two

_____

[2] Ms. Fulmer explained that Bode's Technology is a private DNA lab that performs work for the Tennessee Bureau of Investigation by contract.

-8-

of the blood samples from her apartment contained DNA from an unidentified male depositor.

The State rested, and the defendant, a life-long Knoxville resident with previous convictions for burglary in Tennessee and Ohio, testified that he met the victim in early 2005 at the apartment of a co-worker during a party. He described the victim as "very friendly" and said that they struck up a friendship during the party. He started visiting at her apartment sometime later. He testified that the victim accompanied Mr. Maynard to his residence on two occasions, once to have dinner and once when the two couples went to play bingo in Kentucky. The defendant claimed that he and the victim had sex for the first time "[j]ust before Halloween," explaining, "It was at her apartment, and it was late at night. We smoked some marijuana. One thing led to another, and we had sex." He stated that from then until her death, he and the victim saw each other regularly and had sex "10 to 12" more times, "always after smoking marijuana."

The defendant testified that on May 29, 2006, the victim telephoned him and asked if he had any marijuana and that he told her that he would bring some to her apartment after he got off work. The defendant recalled that he got off work "shortly after 11" and then drove to the victim's apartment. He stated that after the victim let him into the apartment, they "sat on the couch, smoked some marijuana, watched TV." He said he played with the victim's dog and that after the dog bit him on the thumb, the victim gave him toilet paper to wipe the blood. According to the defendant, the victim locked her dog in the bedroom, and they then had sex twice on the living room floor.

He said that afterward the victim asked him to "fix her toilet because it was running continuously." The defendant testified that as he was working on the toilet, he told the victim that he would not "be coming over anymore" because his "wife was getting suspicious." He said the victim became angry, "started arguing," and called him names. According to the defendant, the argument escalated, and he "c[a]me out of the bathroom with the toilet bowl lid in [his] hand." He explained, "I was getting ready to put it back on the toilet when we started arguing, and so I just carried it with me." The defendant testified that he "lost control and beat [the victim] with" the toilet tank lid, adding that although he could not recall how many times he hit her, it was probably more than once. The defendant stated that after the victim fell to the floor, he dropped the toilet lid and it broke. He then "went down to see if she was alive. [He] felt for a pulse, listened for a heartbeat." He claimed that when he was unable to detect either, he started cardiopulmonary resuscitation ("CPR") but did not call 9-1-1 because he was scared of returning to jail. The defendant testified that when he was unable to revive the victim using CPR, he went to his car, retrieved his stun gun, and "tried to shock her heart back to life." According to the defendant, the victim had no reaction to being shocked so he "gave up" and "tried to think what to do next."

The defendant testified that he tried to move the body but was unable to do so because his hand was broken. The defendant denied breaking his hand by striking the victim, saying he never struck her with his fist. The defendant said that as he was going to his car "to look for a rope . . . that [he] could tie and help pull her," he saw the dog leash hanging by the door and "put it around her neck" and used the leash and an area rug to drag the victim to his car. The defendant testified that he had assumed the victim was dead when he drug her to the car until he heard Dr. Mileusnic-Polchan's testimony that it took the victim some time to die after being struck. He put the victim in his car and drove away. He stated that he had "no idea" where he was going, but when he realized he was headed toward his residence on Dry Gap Pike, he "remembered the creek there." According to the defendant, he turned the car around, "went back to the creek, and . . . took her body out of the car and put it in the creek." The defendant admitted that he was guilty of abusing the victim's corpse but denied any intent to kill her saying, "Only thing I wanted . . . to do was just smoke weed."

During cross-examination, the defendant admitted telling both his mother and his wife that he and the victim had only had sex one time, but he claimed he was lying to them because he wanted to salvage his marriage. The defendant testified that after the victim's dog bit him, the victim whispered in his ear, "'I know what you need. You need some ass,' and went to the bedroom after that." He said that the victim was not wearing her glasses when she came out of the bedroom, asked him to move the table, and undressed before telling him to "[l]ie down on the floor." The defendant claimed that the victim removed only her pants when the two had sex and said that he was still naked when he went into the bathroom to try and repair the toilet. According to the defendant, he put the seat down, placed the tank lid on the seat, and the argument ensued as he was fixing the toilet. The defendant testified that when the victim threatened to tell his wife about their affair, he walked into the living room holding the tank lid with his "right hand only by one end." He said that after the victim called him a name, he lifted the tank lid and swung it at the victim with both hands, and he claimed he could not remember anything that happened from the time he struck the first blow "until she was on the floor." The defendant denied striking the victim as she lay on the floor or hearing the victim make noises. He admitted, however, telling Officer Brasfield that the victim was making a gurgling sound and that he hit her on the head with the lid until she quit making the sound.

According to the defendant, he was on the porch "cooling off" when he encountered Mr. Trukken, explaining, "I was hot and sweaty, and was thinking, trying to figure out what to do." He said he led Mr. Trukken away because he "didn't want him around." The defendant conceded that he lied to Mr. Trukken about helping Mr. Maynard.

Discussing his decision to put the victim's body in the creek, the defendant said he first thought he would dump the victim's body at his "fishing hole which is in Loudon

-10-

County, but . . . decided against that because it's too far away and too many people in between that could spot." Explaining why he didn't leave the tank lid in the creek, he said, "My way of thinking then was not to leave the body with the weapon." The defendant claimed that the bloody toilet tank lid officers found in the dumpster was not the one he used to strike the victim. The defendant acknowledged that after he dumped the victim's body, he drove to an automatic teller machine and deposited his work check, drove to the dumpster where he deposited the tank lid and quilt, drove to Walmart to purchase something to clean his car, and, finally, drove to a carwash where he vacuumed as much blood as he could and used Spot Shot to clean the rest. The defendant said he then went home, showered, and went to bed. A "couple" of days later he went to a barber shop and had his hair shaved.

As to his broken hand the defendant stated, "I actually don't know when I broke it. . . . . I know it was during the attack because when I went to give her the cardiac thump, my hand hurt like everything." The defendant consistently denied striking the victim with his fists.

On the basis of this proof, the jury convicted the defendant of the first degree premeditated murder of the victim and the abuse of her corpse. By operation of law, *see* T.C.A. § 39-13-204, the defendant received a sentence of life imprisonment for the conviction of first degree murder. In this appeal, the defendant contends that the trial court erred by denying his motion to suppress the bodily fluids obtained from the victim. He also claims that the trial court erred in the admission of certain evidence and argues that the trial court should not have permitted the prosecutor to argue that the victim had been raped. He also contests the sufficiency of the evidence.

*I.  Motions to Suppress*

*A.  Victim's Bodily Fluids*

The defendant contends that the trial court should have suppressed the bodily fluids obtained from the victim's body during the autopsy because the body, and therefore the bodily fluids, would not have been discovered within a sufficient time to allow for the recovery of the fluids in the absence of the defendant's unconstitutionally obtained statement describing the location of the body. The State asserts that the trial court correctly concluded that the victim's body would have inevitably been discovered by the adjacent property owners before the bodily fluids were consumed by the decomposition of the body.

A brief review of the pretrial procedural history of this case is necessary to the review of this issue. On October 26, 2006, the defendant filed a motion to suppress his pretrial statement to police as violative of his rights "to due process, a fair trial, and the right

to the effective assistance of counsel under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article I, §§ 6, 8, and 9 of the Tennessee Constitution." The defendant claimed that upon custodial questioning by police, he unequivocally invoked his right to counsel and that, following this assertion, members of the KPD "recruited" the defendant's wife to "convince him to waive his right to counsel and to answer the questions" of the officers. The trial court agreed, finding that after the defendant invoked his rights to counsel and to remain silent, KPD Investigator Bell "conversed with [the defendant] about the efforts of the victim's family to try to find their missing family member" in an effort to get the defendant to make a statement. In addition, the trial court observed that Officer Brasfield recruited the defendant's wife to "'help [them] locate the body'" and "urged [her] to 'please give that girl's family some peace'" before sending her in to speak with the defendant, who had already invoked his right to counsel. The court found that following the defendant's conversation with his wife, "Investigator Huckleby, who was aware that [the defendant] had invoked his Fifth Amendment rights, then went into the interrogation room . . . 'to give [the defendant] . . . a little more confidence and to try and get a little more information about what had taken place.'" The trial court suppressed the statement, ruling that "Investigators Huckleby and Bell violated [the defendant's] Constitutional rights when they continued to interrogate him after he invoked his right to remain silent."

Following the trial court's ruling, the defendant filed a motion to suppress the toilet tank lid, clothing, and blood-stained blanket discovered in a dumpster behind the Krystal's restaurant on Maynardville Highway, claiming that "these items constitute fruit of the poisonous tree from [the defendant's] unconstitutionally secured admissions." The trial court agreed and granted the motion.[3]

The defendant filed a third motion to suppress, this time asking the trial court to suppress the victim's "body[] or any evidence derived from the discovery of [the victim's] body including evidence discovered or obtained by the Medical Examiner during an examination of the body or at the time of autopsy, or from later testing . . . related to DNA analysis." The defendant claimed that like the items discovered in the dumpster, the victim's body and any forensic evidence obtained from it, were fruit of his unconstitutionally procured statement.

At the July 11, 2007 hearing on the third motion to suppress, Officer Smith testified that because of the heavy foliage and angle from the road to the creek, the victim's body, which was "facedown" in eight inches of water, was not visible from the road. He stated that the yellow sheet found near the victim's body was visible from the southwest side of the small bridge.

---

[3]The State introduced this evidence at trial based upon an agreement with the defendant.

Forensic Anthropologist and University of Tennessee Professor Emeritus of Anthropology Doctor William M. Bass testified that because the "individual was in the water" and "not completely covered with water," determining the rate of decomposition was complicated. He explained that as a rule of thumb, "the amount of decay you get in one week on land . . . . takes two weeks if you're in water. That'd take eight weeks if you're buried." He noted that

> [w]hen an individual dies . . . he begins . . . to give off a smell, and the first of the insects to be attracted to that, to that dead body, are what are called blow flies. These are the green and blue iridescent flies. Now, they're attached to the moist orifices of the body: The eyes, the nose, the mouth, or any wound on the body.
>
> But in this case, the young lady went into the water face down. The wounds to the body are on the face, and that covers up the wounds of the body. . . . The only orifice of the body is the anus that is above . . . the water level, and so . . . your water then has eliminated the flies getting into the wound area.

He explained that there are four stages of decay: "Fresh[;] . . . bloat, this is where the gases build up and the body bloats, looks like a balloon; decay; and dry." He stated that "normally humans don't smell a body in that active decay stage. This is where the . . . flies can smell a decayed body long before humans can." According to Doctor Bass, the victim's body was "just beginning to get into the bloat stage" and her body was releasing some gas from her exposed anus, which attracted the blow flies. He testified that he "would doubt that there would be much smell there." He said it would have been "another two to three weeks" from when the victim was found before her decaying body would began to emit a strong foul odor. At that point, he said, someone standing downwind from the bridge would likely be able to smell the decay. Even then, though, he stated that he did not believe that one would be able to "smell her very far" and that the smell would likely travel only east. Doctor Bass testified that even though the body "would be much more advanced in decay than . . . when it was found," he doubted whether any odor from the body would have traveled "more than 50 feet." He stated that the fact that the body was partially submerged in water would not have had "much effect" on any DNA found inside the victim's vagina.

During cross-examination, Doctor Bass testified that a farm owned by Bob Marshall was located "too far, way too far to smell" any odor emanating from the body even in the bloat stage. He stated that "between the right and left buttocks, [there were] not only

-13-

the fly eggs but a lot [of] live maggots in there, and these maggots are not very old." He explained, "[T]he maggots now are going to enter the body, and they're going in through the anal opening. They will start eating away on the soft tissue that's in there. . . . [T]hey eat from the colon into the vaginal area." Doctor Bass testified that if the victim's body had remained in the creek "another week or two, you would have probably had maggots in the vaginal area." According to Doctor Bass, the maggots would eat "everything they can get ahold of" and "eventually all you've got is just the bones left." He said that after "three or four more weeks" in the creek, the bruising around the victim's neck caused by the dog chain would not have been distinguishable. Doctor Bass stated that although the odor from the decaying body would have been stronger had she remained in the creek for another four weeks, the vaginal cavity would have been destroyed by maggots by that time.

On redirect examination, Doctor Bass testified that a person standing across the road two to three weeks after the victim was found would have been able to smell the body "if you're getting any wind at all." He stated that maggots would be present in the vaginal cavity "before you got into the active decay stage." He also testified that the neck area would not decay "as rapidly as the vaginal area . . . . Because you're decaying inside first."

During recross-examination, Doctor Bass opined that the victim's vaginal vault would have been destroyed within "two to three weeks" of when the victim was found and the injuries to her neck would have been indistinguishable within four to five weeks. He also testified that the vaginal vault would have been destroyed by maggots before the victim's body began to emit a detectable smell. He reiterated that at no time would the smell have been detectable from the Marshall property.

Knox County Chief Medical Examiner Doctor Sandra Elkins, who performed the autopsy of the victim's body, testified that the [c]ause of death was blunt force head injury secondary to blows and strangulation." She stated that at the time she performed the autopsy, the victim's vaginal cavity was intact and there were no maggots present. Doctor Elkins testified that the "internal findings at autopsy" led her to conclude that strangulation had played a part in the victim's death.

Hollis Malin, Jr., testified that he lived at 809 Dry Gap Pike, otherwise known as the Sterchi Mansion, which sits adjacent to the creek where the victim's body was found. Mr. Malin stated that although he was out of town for two weeks when the victim's body was dumped in the creek, the gentleman that worked for him stayed at the house while they were gone to cut the grass and take care of his dogs. He explained that he had the grass cut on his property weekly unless there is a drought. He added that he owned two golden retrievers that made a habit of going to the creek and bringing objects back. Based on these circumstances,

-14-

Mr. Malin testified that there was "[n]o doubt in [his] mind at all" that the body would have been discovered by him or someone who works for him. He explained,

> Number one, the dogs would have probably discovered her, and every time - - we go to church down Jim Sterchi Road and . . . I'm always looking at the sides of the . . . street, so I would have seen that, where she was laying, I'm positive I would have, besides the fact that the odor, you know, we would have smelled that . . . .

During cross-examination, Mr. Malin testified that his house was more than 137 feet from the creek. He admitted that few people walk along Jim Sterchi Road because of the high traffic volume and narrow road. Mr. Malin stated that he often cleans up trash along the road side of his property.

Bob Marshall testified that he owned "10 to 12 acres where the old Sterchi barns [are] at" directly across Jim Sterchi Road from where the victim's body was found. He stated that he picks up trash near where body was found "every day or two."

During cross-examination, Mr. Marshall agreed that the bridge where the body was found was 285 feet from his property line. He also conceded that although he regularly mowed beyond his property line to keep the line of sight for the road clear, he did not see the victim's body in the creek.

The victim's mother, Judith Eubanks, testified that had the victim's body not been found on June 3, 2006, she had planned to go to "the fish farm" to look for the victim on the basis of a dream her brother had. She claimed she was "going to go to th[e] location" where the victim's body was found because she was familiar "[w]ith that whole area." She said, "Sterchi farm and the fish farm is the very same place."

Brian Garven, who worked at EFG Forensic, "a traffic accident reconstruction consulting company," testified that on the basis of a request from the defense, he performed "line of sight" studies at the location where the body was found. From these studies, he concluded that the victim's body could not have been seen by someone in a passing car from either direction. He said that the sheet would have been visible for "just barely less than half a second" to a driver traveling 25 miles per hour and looking directly at the area. He added that the "bush line" would have prevented the victim's body from being seen from the road also.

Mr. Garven admitted that a person walking along the roadside would have the

best chance to see the body.

Isaac Merkle, systems administrator with the public defender's office, testified that he took still photographs and video at the location where the victim's body was found in addition to taking various measurements. He said that Mr. Marshall's driveway was "280 feet from the location where the body was found" and that the area between Mr. Marshall's driveway and the location of the body was not mowed when he visited. He described the area as "natural and rugged." Mr. Merkle testified that he also observed a "[c]onsiderable amount of trash" along Jim Sterchi Road.

On the basis of this testimony, the trial court made the following determinations:

> I wouldn't feel comfortable in finding that this body would have been discovered by a passerby in a vehicle. . . . [B]ecause the foliage that existed there at the time, at least within a reasonable period of time with the foliage that existed, the positioning of the body, the fact that it was off the road where it was and out of line of sight, I think it unlikely that just people passing in a vehicle would have - - would have seen this.
>
> Now, they may have seen the sheet. The sheet is much more visible and much higher up in the foliage itself . . . . I wouldn't be comfortable in saying that an individual driving by in a vehicle would think enough of that to stop the vehicle, get out and investigate further.
>
> But that isn't all the proof that we have here, and very candidly, the two witnesses who struck me as being very important this afternoon have been Mr. Marshall and Mr. Malin . . . who both testified that their properties are in very close proximity.
>
> I think Mr. Malin said that his property line is within 15 feet of this culvert itself and that it's regularly mowed. Of course, this was June 3rd, so this would have been mowing season, except for this year, and that although while he was out of town, . . . this individual who stayed at the house . . . and kept the dogs who were outside, and the dogs were of the type that run on the property and brought back things.

-16-

And then Mr. Marshall testified . . . . that his business which he owns is located down the road . . . . But his testimony was that . . . knowing his character and his habits, was that he routinely not only clears his property with a weed eater and other machinery but he regularly . . . picks up the trash, that it irritates him that people pull off Dry Gap Pike onto Sterchi Road, and immediately . . . they throw their trash out the window, and he says he on a regular basis . . . will patrol . . . the road even to the extent of going down into the creek and picking things up out of the creek, and that to me . . . is very important.

The court also found that "people occasionally walk Sterchi Road." The court ruled,

I find by a preponderance of the evidence that this body would have been found either by Mr. Marshall, by Mr. Malin's employee, or by other . . . pedestrian individuals traveling up and down the Sterchi Highway. . . . [B]ased on everything that I've heard here today with regard to the odor that would have been emitted and the time frame in which it would have been emitted and how long it would have been that the evidence would have been preserved with the body partly being in the creek and partly being exposed . . . and when the evidence would be destroyed, I'm satisfied that by a preponderance of the evidence that this body would have been found within a time sufficient to allow people who do forensic examinations to find not only the . . . markings on the neck and the head but the DNA evidence.

Finally, the court refused to "rule based on somebody's dream" and concluded that "if that was the only testimony I heard today, you would not have prevailed."

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We review the issue in the present appeal with these standards in mind.

Generally, evidence obtained as a direct or indirect result of unconstitutional police conduct will be excluded as the "fruit" of the primary constitutional breach. *See generally Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others . . . ."); *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963), ("We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"(quoting Maguire, *Evidence of Guilt*, 221 (1959)). Under the doctrine of "inevitable discovery," however, illegally obtained evidence will be deemed admissible at trial if the State can establish that the evidence would have inevitably been discovered by lawful means. *See State v. Patton*, 898 S.W.2d 732, 735 (Tenn. Crim. App. 1994) (citing *Nix v. Williams*, 467 U.S. 431 (1984)). Before the inevitable discovery doctrine will permit the admission of illegally obtained evidence, the State must demonstrate "'first, that certain proper and predictable investigatory procedures would have been utilized in the case at bar, and second, that those procedures would have inevitably resulted in the discovery of the evidence in question.'" *State v. Coury*, 657 S.W.2d 777, 780 (Tenn. Crim. App. 1983) (quoting *Stokes v. State*, 423 A.2d 552, 556 (Md. 1980)). Proof of inevitable discovery may involve "no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5; *see State v. Cothran*, 115 S.W.3d 513, 525 (Tenn. Crim. App. 2003) (stating that under inevitable discovery doctrine, illegally obtained evidence is admissible if the evidence would have otherwise been discovered by lawful means).

In *Nix*, the seminal case adopting and applying the inevitable discovery doctrine, Nix abducted ten-year-old Pamela Powers from a Des Moines, Iowa YMCA on Christmas Eve in 1968. *Id.* at 434-35. As 200 volunteers searched the area where the child was last seen, Nix turned himself in to authorities in Davenport, Iowa, and was transported by car to Des Moines. *Id.* at 435. During the trip, officers initiated a conversation with Nix that resulted in his making incriminating statements and guiding the police to the child's body. *Id.* at 435-36. Although Nix's statements were ruled inadmissible, the prosecution was allowed to offer evidence concerning the location and condition of the body under the theory that had the search continued, the body would have been discovered within a short time and in the same condition as actually found. *Id.* at 437-40.

To support this theory, the prosecution offered specific evidence that the body inevitably would have been discovered by the volunteer search team, which had ended its search only two and one-half miles from the location of the body after the defendant identified the location. *Id.* at 449. Testimony established that, based on earlier progress during the search, the search party would have discovered the body in an additional three to five hours had the search continued. *Id.* at 449. "On this record," the Supreme Court concluded, "it is clear that the search parties were approaching the actual location of the body, and we are satisfied, along with three courts earlier, that the volunteer search teams would have resumed the search had Williams not earlier led the police to the body and the body inevitably would have been found." *Id.* at 449-50.

The need for "demonstrated historical facts capable of ready verification or impeachment," *id.* at 444 n.5, was illustrated by this court's opinion in *State v. Carpenter*, 773 S.W.2d 1 (Tenn. Crim. App. 1989). In that case, Carpenter bludgeoned a store manager to death in connection with a robbery, an act to which he later confessed. During his confession, Carpenter disclosed that he had deposited his bloody clothing into a dumpster, and police recovered the clothing from the dumpster on March 29. The trial court suppressed Carpenter's statement but allowed the State to introduce the clothing under the theory that the defendant had abandoned the clothing. *Id.* at 1-7. On appeal, this court rejected abandonment as a basis for admitting the clothing and, in response to the State's alternative argument that the clothing was admissible under the doctrine of inevitable discovery, concluded that the State had failed to factually demonstrate the inevitability of the discovery because Carpenter established that the trash would have been picked up on March 30th for transport to the landfill.

In this case, Doctor Bass testified that at the time the victim's body was discovered, it would not have emitted an odor strong enough to travel to either Mr. Marshall's or Mr. Malin's property. Within two or three weeks, however, as her body continued to decay, it would have begun to emanate an odor that would have been detectable as far as 50 feet away and, with "any wind at all," would have been detectable across the road. Both Mr. Marshall and Mr. Malin testified that their properties were mowed regularly and that they each took pains to clear trash along the roadway near the bridge, bringing them in close proximity to and within an area to view the victim's body. Although Doctor Bass testified that maggots would have destroyed the victim's vaginal cavity had she remained in the water for four weeks, the trial court specifically ruled that either Mr. Marshall or Mr. Malin would have discovered the victim's body before that happened. In our view, testimony from Mr. Marshall and Mr. Malin that it was their regular practice to mow their properties to an area from which they would have detected the odor from the victim's decaying body and could have seen the body as it lay in the creek satisfactorily supports the trial court's finding that the victim's body would have been discovered even without the

defendant's statement divulging the location of the body. Moreover, given the witnesses' regular mowing habits and the fact that the victim's body was dumped during a busy mowing season, we agree with the trial court that the State sufficiently established that the victim's body would have been discovered before the destruction of the victim's vaginal cavity and any DNA evidence located therein. Accordingly, the trial court did not err by denying the defendant's motion to suppress the bodily fluids obtained during the autopsy of the victim's body or the results of DNA testing performed on those fluids.

## B. Recorded Telephone Conversations

The defendant asserts that the trial court erred by denying his motion to suppress telephone conversations between the defendant and various members of the defendant's family recorded during the defendant's pretrial incarceration. He claims that the electronic recording of these conversations in the absence of a warrant violated his reasonable, but reduced, expectation of privacy. The State denies any Fourth Amendment violation in the recording of the calls because the defendant's incarceration and his awareness that the calls were being recorded militates against a finding that the State violated the defendant's reasonable expectation of privacy. The trial court agreed with the State, ruling that the defendant was "given notice on each and every occasion when he makes these phone calls that . . . [they] are subject to being recorded . . . and . . . there is just not any reasonable expectation of privacy on [the defendant's] behalf." We agree.

Again, we review this issue with the aforementioned standards in mind. Namely, we defer to the trial court's findings of fact but review de novo its application of the law to those facts. *See Binette*, 33 S.W.3d at 217; *Odom*, 928 S.W.2d at 23; *Keith*, 978 S.W.2d at 864.

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and that any evidence discovered is subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). Thus, a trial court necessarily indulges the presumption that a warrantless

search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure.

"The interception of a conversation in which a person has a reasonable expectation of privacy constitutes a search within the meaning of the Fourth Amendment." *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001) (citing *Katz*, 389 U.S. at 353, 88 S. Ct. at 512). To properly evaluate the issue under both our state and federal constitutions, we must determine "(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001)).

Considering the first question, whether the defendant had "an actual, subjective expectation of privacy," we remain mindful that "a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day." *Lanza v. New York*, 370 U.S. 139, 143-44 (1962). The recorded calls themselves establish that a recorded voice informed conversation participants that the call was being recorded. Furthermore, testimony at trial established that inmates were required to provide the numbers of individuals they intended to call and that they received personal identification numbers from jail officials to be used when placing the calls. Given primarily that the defendant was told explicitly and on more than one occasion that his calls were being monitored and recorded by jail officials, we cannot see how the defendant can credibly argue that he possessed a reasonable and legitimate expectation that the calls would remain private. *See State v. Leonard D. Hutchison*, No. 1028, slip op. at 9 (Tenn. Crim. App., Knoxville, July 23, 1987) (holding that "appellant had no expectation of privacy when he used the jail telephone [because] he was fully aware at the time he made the call that his conversation was being recorded, and . . . he continued to be aware of the monitoring, as shown by statements made during the conversation").

Considering the second inquiry, whether the defendant possessed an objective expectation of privacy deemed reasonable and justifiable by society as a whole, we note that our own supreme court has observed that "the policy of maintaining prison security is a legitimate factor that may bear upon the objective reasonableness of an expectation of privacy." *Munn*, 56 S.W.3d at 496. Although we agree with the defendant that incarcerated individuals are not stripped entirely of their constitutional rights at the moment of incarceration, we cannot agree that society would deem reasonable an expectation that calls placed from jail would remain private. As was the case in *Hutchison*, the conversations in this case were "taped as part of a continuous jail master tape, which was made in a non-surreptitious manner, without discrimination to the users, within the ordinary course of

-21-

the duties of the law enforcement officers to provide general house security and to preserve evidence that prisoners were allowed to use the telephone." *Leonard D. Hutchison*, slip op. at 9. Under these circumstances, the defendant had no objective expectation of privacy in the recorded conversations.

Because the defendant had neither an actual, subjective expectation of privacy nor an objective expectation of privacy in the recorded conversations, the trial court did not err by denying the defendant's motion to suppress the calls.

*II. Evidentiary Issues*

*A. Crime Scene Video*

The defendant asserts that the trial court should not have permitted the State to exhibit to the jury those portions of a videotape recording of the crime scene that depicted the victim's body being removed from the creek and carried up the bank. He claims that the videotape recording was "highly inflammatory as it shows [the victim] in a decomposed state" and "not relevant to any issue in the trial." The State contends that the videotape "was relevant to the issue of abuse of a corpse" and not overly inflammatory.

"The admissibility of authentic, relevant videotapes of the crime scene or victim is within the sound discretion of the trial judge, and his ruling on the admissibility of such evidence will not be overturned without a clear showing of abuse of discretion." *Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993) (citing *State v. Teague*, 645 S.W.2d 392, 397 (Tenn. 1983)). Where the probative value of photographic evidence outweighs the danger for unfair prejudice, the evidence is admissible if relevant. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See Banks*, 564 S.W.2d at 951.

Here, the videotape displays the manner in which the defendant had disposed of the victim's body, which was relevant to the jury's determination of the defendant's guilt of abusing the victim's corpse, and it documents the defendant's efforts at concealing the crime, which was relevant to the issue of whether the defendant premeditated the victim's murder. Moreover, the videotape, although certainly unpleasant, is neither gruesome nor inflammatory. In consequence, we cannot say that its probative value is outweighed by the danger of unfair prejudice.

## B. Defendant's Prior Convictions

The defendant argues that the trial court "abused its discretion when it allowed the State to" impeach his trial testimony using convictions that were greater than 10 years old. The State submits that the convictions "were probative of the defendant's credibility, and that the probative value outweighed any prejudicial effect." For the reasons discussed more fully below, the defendant is not entitled to relief on this issue.

Rule 609 of the Tennessee Rules of Evidence provides, in pertinent part, as follows:

(a) General Rule – For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:

(1) The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction may be established by public record. If the witness denies being the person named in the public record, identity may be established by other evidence.

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

(b) Time Limit. – Evidence of a conviction under this

rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release. Evidence of a conviction not qualifying under the preceding sentence is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect.

Tenn. R. Evid. 609(a)-(b). We review the trial court's determination of this issue via an abuse of discretion standard. *State v. Thompson*, 36 S.W.3d 102, 110 (Tenn. Crim. App. 2000).

Prior to trial, the trial court ruled that the State would be permitted to use seven of the defendant's prior convictions to impeach his credibility should he choose to testify at trial. The court concluded that the probative value of the convictions, the bulk of which were for burglary, on the defendant's credibility outweighed any potential prejudicial effect. At trial, defense counsel first asked the defendant about the convictions at the outset of his testimony on direct examination. The State asked no questions about the convictions. Thus, although the trial court ruled that the State could use the convictions to impeach the defendant's testimony, the record establishes that the State did not actually do so. The fact that the State did not utilize the convictions to impeach the defendant's testimony lessened their impact on the defendant's credibility. Further, the convictions were mentioned only briefly at the beginning of the defendant's very lengthy testimony, and no certified copies of the convictions were entered into the record. Under these circumstances, we cannot say that the defendant was prejudiced by the trial court's decision, even if it was erroneous. *See* Tenn. R. App. P. 36(b) (stating that appellate relief should not be granted "unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process"). In consequence, the defendant is not entitled to relief on this issue.

## C. State's Theory of Rape

The defendant claims that the trial court erred by permitting the State to argue that the defendant "raped the victim and then killed her to cover up the rape, where the evidence of rape was uncharged conduct under Tennessee Rule of Evidence 404(b), the

-24-

[c]ourt failed to conduct a hearing on the admissibility of the evidence, and the allegation of rape was not proven by clear and convincing evidence." The State contends that the defendant waived our consideration of the issue by failing to make a contemporaneous objection during the State's closing argument and by failing to include the issue in his motion for new trial. In the alternative, the State contends that the prosecutor's argument "was a fair comment on the evidence."

The State correctly asserts that the defendant waived this issue by failing to lodge a contemporaneous objection, *see* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987), and by failing to include the issue in his motion for new trial, *see* Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). The defendant concedes waiver, noting that "[t]he issue was inadvertently left out of the motion for a new trial," but he asks this court to review the issue "as plain error" pursuant to Tennessee Rule of Criminal Procedure 52(b).[4]

Pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure, "an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial" where consideration of the error is "necessary to do substantial justice." Tenn. R. App. P. 36(b). Before an error may be so recognized, however, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). The word "'plain' is synonymous with 'clear' or equivalently 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734 (1993) (citing *United States v. Young*, 470 U.S. 1, 16 n.14, (1985)). Authority

---

[4]Effective July 1, 2009, Rule 52 of the Tennessee Rules of Criminal Procedure was "deleted because harmless error and plain error are covered in amended Tennessee Rule of Appellate Procedure 36(b)." Tenn. R. Crim. P. 52, Advisory Comm'n Cmts. For this reason, all citations regarding the effect of error in this opinion are to Rule 36 of the Tennessee Rules of Appellate Procedure. Our analysis of whether an error qualifies as plain remains the same under either rule.

to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 732, 113 S. Ct. at 1776 (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court adopted the definition of "substantial right" promulgated by this court in *Adkisson*. There, we held that "a 'substantial right' is a right of 'fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature.'" *Adkisson*, 899 S.W.2d at 639. Our supreme court also adopted *Adkisson's* five factor test for determining whether an error should be recognized as plain:

> "(a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is 'necessary to do substantial justice.'"

*Id.* (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. To be reviewable as "plain," the error "must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (alteration in original). Finally, "the burden of establishing entitlement to relief for plain error is on the defendant claiming it." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004).

Before beginning any analysis of this issue, it is necessary to cast the issue in proper terms. Although the defendant claims error via a violation of Tennessee Rule of Evidence 404(b) on the basis that "the evidence of rape was uncharged conduct," the record is clear that the State offered no evidence at trial that the defendant had raped the victim. The only proof regarding the sexual encounter between the defendant and the victim on the day the victim died came in the form of testimony from the defendant, who claimed that the encounter was consensual, and Dr. Mileusnic-Polchan, who stated that she could not tell whether the encounter was consensual. Further, although the trial court ruled prior to trial that the State would be permitted to adopt as its theory that the sexual encounter was not

-26-

consensual, the court specifically ruled that the State would not be permitted to argue that the defendant had raped the victim and even prohibited any references to the medical examiner's performing a "rape kit." Rule 404(b) excludes "[e]vidence of other crimes, wrongs, or acts." Evidence is defined as "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact." *Black's Law Dictionary* (8th ed. 2004). Because the State offered no evidence that the defendant raped the victim, the issue does not fall within the ambit of Rule 404(b).

The first mention of the defendant's raping the victim actually comes during defense counsel's closing argument when he says "[w]hat I think the [S]tate is saying . . . is that [the victim] could have been raped." Defense counsel goes on to speculate on the State's theory of the case:

> [A]fter the nonconsensual sex, [the defendant] is going to be identified and prosecuted. So I guess . . . in order to accomplish the nonconsensual sex, he must use the stun gun. That must be the purpose that they wanted to bring that in there, and maybe the leash in order to control her while he's forcing her to have nonconsensual sex, and then I guess he's got to kill her in order to avoid being identified and prosecuted . . . . Is that . . . what the [S]tate proved to you beyond a reasonable doubt?
>
> I think [the defendant's] story is just as plausible as – if that's the [S]tate's theory. I can't even stand up in front of you and tell you what their theory is in terms of how did the murder itself occur, and so I can't even refute it because they're sort of noncommitted [sic] on what it is."

In an apparent response to defense counsel's argument, the prosecutor made the following statements during her rebuttal:

> Don't think for one second that this young lady had consensual sex with [the defendant]. What happened was he brought that stun gun, stunned her, raped her. In the middle of the rape, she comes to. He gets scared. He gets paranoid, and he starts to hit her with his fist, but he breaks his fist.

She candidly admitted to the jury, however, that this was only her theory of what had happened in the victim's apartment and that she could not prove beyond a reasonable doubt that the defendant had raped the victim. The prosecutor stated that she did not "care if it was

consensual, if it was nonconsensual. . . . It doesn't matter. [The victim] did not deserve what happened to her." The prosecutor's comments during rebuttal were the only reference made by the State to a theory that the defendant had raped the victim.

Because the only reference to the defendant's raping the victim came during closing argument, the appropriate inquiry is whether the State engaged in improper argument. Trial courts have substantial discretionary authority in determining the propriety of final argument, but the trial court must restrict any improper argument. *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978). Most restrictions during final argument are placed upon the State, based in great measure upon the role of the prosecutor in the criminal justice system:

> [The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. . . .

*Berger v. United States*, 295 U.S. 78, 88 (1935). The State must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial. More specifically, the prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial. *See Dupree v. State*, 219 Tenn. 492, 495-97, 410 S.W.2d 890, 891-92 (1967); *Moore v. State*, 159 Tenn. 112, 124, 17 S.W.2d 30, 35 (1929); *Watkins v. State*, 140 Tenn. 1, 8-9, 203 S.W. 344, 346

(1918); *McCracken v. State*, 489 S.W.2d 48, 50 (Tenn. Crim. App. 1972).

To be sure, closing argument for both parties "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978). To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict. *Harrington v. State*, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965). When determining the propriety of closing argument, this court considers the following factors:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
> (2) [t]he curative measures undertaken by the court and the prosecution[;]
> (3) [t]he intent of the prosecutor in making the improper statements[;]
> (4) [t]he cumulative effect of the improper conduct and any other errors in the record [; and]
> (5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

As indicated, defense counsel was the first to suggest that it was the State's theory that the defendant had killed the victim to prevent her from identifying him as a rapist. The record establishes that the prosecutor's comments were made entirely in response to defense counsel's argument. Although the prosecutor's statement arguably includes facts not in evidence, defense counsel did not object to the argument, and the prosecutor admitted that she could not prove her assertions beyond a reasonable doubt. Under these circumstances, the record does not establish either that "the accused did not waive the issue for tactical reasons" or that "consideration of the error is 'necessary to do substantial justice.'" *See Smith*, 24 S.W.3d at 282. Accordingly, we cannot say that the prosecutor's argument, even if improper, rises to the level of "plain error."

### III. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to prove beyond a reasonable doubt that he premeditated the victim's murder or that the victim was dead before he dumped her body into the creek. The State contends that the evidence was sufficient to support the convictions of first degree premeditated murder and abuse of a corpse.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654. Although a criminal offense may be established exclusively by circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973); *Winters*, 137 S.W.3d at 654, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). "In other words, '[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.'" *State v. McAfee*, 737 S.W.2d 304, 306 (Tenn. Crim. App. 1987) (quoting *Crawford*, 470 S.W.2d at 613).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

### A. Premeditated First Degree Murder

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202 (2003). As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

-30-

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007)*; see also State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* § 7.7 (2d ed. 1986)). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

Here, the proof adduced at trial established that the defendant beat the unarmed victim with the lid to her toilet tank. The defendant, who asserted that he initially possessed the toilet tank lid while fulfilling the victim's request that he repair her toilet, admitted carrying the crude weapon from its resting place in the bathroom and into the living room so that he could "face" the victim as they argued. Although the defendant claimed he did not know how many times he struck the victim, he admitted that it was more than once. He also conceded on cross-examination that he told investigators that he hit the victim until the tank lid broke and then continued to strike her with the broken lid. Doctor Mileusnic-Polchan confirmed that the victim was struck multiple times with a blunt object and that some of the injuries were consistent with the victim's being struck by the intact lid while some were consistent with the victim's being struck by the broken lid. Doctor Mileusnic-Polchan opined that the victim lay prone on the floor when she received the brunt of the blows, pointing particularly to "the fractured skull and the crushing injury of the brain" as evidence that the victim was on the ground rather than standing. She also stated that the location of the skull fractures indicated that the victim's back was to the defendant as he struck her. Further, Doctor Mileusnic-Polchan's testimony established that the victim was alive when the defendant placed the dog leash around her neck, making ligature strangulation a contributing cause of death.

Immediately following the victim's death, the defendant coolly lied to Mr. Trukken that Mr. Maynard had asked the defendant to help him move, thereby explaining his own presence at the apartment and the location of his car directly in front of the apartment, and he led Mr. Trukken away from the scene of the victim's murder by walking him down to Sam's Party Store. Although Mr. Trukken testified that the defendant was "somewhat

shaky," he clarified that the defendant's demeanor gave him no reason to believe that the defendant had just beaten his friend to death or that her badly mangled body lay only feet away. The defendant then wrapped the victim's body, with the dog leash still around her neck, in an area rug, placed it into the backseat of his car, and drove to the creek where he dumped her body. After dumping the body, the defendant deposited his paycheck, dumped the remaining evidence of his crime in a dumpster, and cleaned the blood from his car. He then went home, took a shower, and went to bed. Although the defendant went to great lengths to conceal the killing, there was no evidence that he made preparations to do so prior to the killing. That being said, however, the defendant's procurement of the toilet tank lid from the victim's bathroom; the multiple, vicious blows inflicted upon the unarmed and prone victim that crushed not only her skull but her brain itself; the use of the dog leash to strangle the victim; and the defendant's relatively calm demeanor following the particularly cruel killing all support the defendant's conviction of premeditated first degree murder.

## B. Abuse of a Corpse

As charged in this case, "[a] person commits an offense who, without legal privilege, knowingly . . . [p]hysically mistreats a corpse in a manner offensive to the sensibilities of an ordinary person." T.C.A. § 39-17-312(a)(1). The defendant argues that the State failed to establish beyond a reasonable doubt that he committed the offense of abuse of a corpse because "discarding [the victim's] body in the shallow creek, though maybe offensive, does not recognize the additional requirement that one 'physically mistreat' the corpse." He asserts that his conduct in dumping the victim's body satisfies the elements of Code section 39-17-312(a)(3), which permits a conviction for abuse of a corpse for one who "[d]isposes of a corpse in a manner known to be in violation of law," but, because the State did not charge him under this section of the statute and the jury was not instructed on it, he cannot be found guilty via this method of abusing a corpse. He also contends that because Doctor Mileusnic-Polchan's testimony established that it was possible that the victim was alive when the defendant dumped her body in the creek, the State failed to establish that he had abused a corpse. The State argues that the defendant is guilty of abusing a corpse "[e]ven if the victim was not dead when the defendant discarded her face down in the creek" because he knew or should have known that she would die there.

We agree with the defendant that our inquiry is limited to whether sufficient evidence was presented to establish that he "physically mistreated" the victim's corpse "in a manner offensive to the sensibilities of an ordinary person." We do not agree, however, that the State failed to establish the elements of Code section 39-17-312(a)(1).

The defendant himself conceded during his testimony on direct examination that he had abused the victim's corpse. Although the defendant's testimony qualifies as a

-32-

confession, *see Helton v. State*, 547 S.W.2d 564, 567 (Tenn. 1977) (explaining that "a confession is a statement by the accused that he engaged in conduct which constitutes a crime. . . . an acknowledg[]ment of guilt itself") (citation and internal quotation marks omitted), "a conviction cannot be based solely on a defendant's confession and, therefore, . . . the State must present some corroborating evidence to establish the corpus delicti," *see State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000)). The term corpus delicti refers to "the body of the crime [or] evidence that a crime was committed at the place alleged in the indictment," and the State needs "only slight evidence of the corpus delicti . . . to corroborate a confession and sustain a conviction." *Smith*, 24 S.W.3d at 281. When a defendant confesses to a crime, the corroborating evidence "'need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession.'" *State v. Housler*, 193 S.W.3d 476, 490 (Tenn. 2006) (quoting *Ricketts v. State*, 192 Tenn. 649, 654-55, 241 S.W.2d 604, 606 (1951)). Here, the defendant claims there was no evidence that he "physically mistreated" a "corpse;" we will consider each element in turn.

### 1. Physically Mistreat

The evidence adduced at trial established that the defendant murdered the victim by striking her repeatedly with the lid from her toilet tank and then placing a dog leash around her neck, he said, to drag her body to his car. Although the defendant stated that he believed the victim had died before he placed the leash around her neck, Doctor Mileusnic-Polchan testified that the presence of petechiae on the victim's scalp indicated that the victim was alive when the leash was placed around her neck and that the crushing injuries to the victim's neck indicated that horizontal strangulation was a contributing cause of her death. At some point, the defendant used the dog leash and area rug to drag the victim's body from her apartment, placed her body in his car, and then drove toward his residence on Dry Gap Pike. He then dragged her body from his car and dumped it into the creek. It is not clear how the defendant got the victim's body into the creek, but the crime scene video showed the victim's partially nude body lying face down in the shallow creek just below a thick stand of foliage. This evidence sufficiently establishes that the defendant physically mistreated the victim's body.

### 2. Corpse

The defendant argues that to satisfy the elements of Code section 39-17-312 the State must establish that the victim was actually dead at the time the body was physically mistreated. Noting that no definition of the word "corpse" appears in the Code, the defendant asks that this court give the term its "fair import." Although the defendant is correct that no definition of the term appears in the Code, the courts of this state have

routinely used the terms "corpse" and "dead body" interchangeably. *See, e.g., State v. Brobeck*, 751 S.W.2d 828, 832 (Tenn. 1988) (distinguishing aggravated rape of murder victim from necrophilia); *State v. Vestal*, 611 S.W.2d 819, 820-21 (Tenn. 1981); *State v. Dennis*, 198 Tenn. 325, 330-31, 279 S.W.2d 512, 515 (1955) (quoting 14 Am. Jur. *Dead Bodies* § 19 with approval); *Hill v. Travelers Ins. Co.*, 154 Tenn. 295, 299, 294 S.W. 1097, 1098 (1927); *Thompson v. State*, 105 Tenn. 177, 182, 58 S.W. 213, 214 (1900); *Robert L. Wilks v. State*, E2002-00846-CCA-R3-PC, slip op. at 3 (Tenn. Crim. App., Knoxville, Dec. 13, 2002) (noting that common law crime of indecently disposing of a dead body had been codified in Code section 39-17-312); *see also Debbie Harris v. Dan Horton and Robertson County*, No. M2008-02142-COA-R3-CV, slip op. at 5-7 (Tenn. Ct. App., Nashville, June 23, 2009). Further, the term corpse is defined in Ballentine's Law Dictionary as "[t]he dead body of a human being." *Ballentine's Law Dictionary* (3d ed. 1969). Thus, the fair import of the term "corpse" as used in Code section 39-17-312 is the body of the deceased. That being said, we must determine whether sufficient evidence existed from which the jury could conclude that the victim was dead at the time the defendant physically mistreated her body.[5]

The defendant points to a brief portion of Doctor Mileusnic-Polchan's testimony in support of his contention that the victim was alive when he dumped her body in the creek. Doctor Mileusnic-Polchan testified that it took the victim "a while" to die and that there was "[a]morphous polarizable foreign material" in the victim's lungs, suggesting that "she was alive and she was breathing in whatever was around her from the environment, whether it was from . . . the water from the creek and it was mixed with her own vomit . . . or gastric content that both can be present." Doctor Mileusnic-Polchan went on to say that if the victim had aspirated something "from the creek, then it's going to polarize, and her material in her lung did polarize." Doctor Mileusnic-Polchan did not say, and was not asked, whether material aspirated from the victim's gastric contents would polarize under the microscope. Doctor Mileusnic-Polchan also testified, however, that the causes of the victim's death were blunt force trauma and ligature strangulation. Drowning was not listed as a contributing cause of the victim's death. The defendant himself testified that the victim had no heartbeat and was not breathing when he dragged her body from the apartment. Given that Doctor Mileusnic-Polchan's testimony at best indicates only a possibility that the victim aspirated material from the creek, we cannot say that the State failed to present sufficient evidence to corroborate the defendant's in-court confession that he had abused the

---

[5]The State asserts in its brief that proof that the defendant believed the victim was dead when he placed the victim's body in the creek and that the defendant placed the victim's body in the creek with fatal injuries is sufficient to support his conviction for abuse of a corpse. Because we have concluded that the statute requires proof that the defendant physically mistreated the victim's dead body, this claim must necessarily fail. As we will discuss, however, there was sufficient evidence from which the jury could conclude that the victim died before the defendant physically mistreated her body.

-34-

victim's corpse.

*Conclusion*

Because the State established that the victim's body would have inevitably been discovered by one of the adjacent landowners, the trial court did not err by denying the defendant's motion to suppress the bodily fluids obtained from the victim's body or the results of the subsequent DNA testing on those fluids. The defendant had no reasonable, legitimate expectation of privacy in the telephone calls he placed while incarcerated, and, therefore, the trial court did not err by denying the defendant's motion to suppress the recorded telephone conversations. The trial court did not err by admitting into evidence a videotape of the crime scene, and any error in the trial court's ruling that the defendant's prior convictions could be used for impeachment purposes was harmless. In addition, the prosecutor's statements during closing argument regarding the State's theory of the case, even if improper, do not rise to the level of plain error. Finally, the evidence submitted at trial was sufficient to support the defendant's convictions for first degree premeditated murder and abuse of a corpse. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE