# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs November 20, 2013 at Knoxville

## STATE OF TENNESSEE v. JERRY CRAWFORD, JR.

**Appeal from the Circuit Court for Madison County**
**No. 11-662      Roy B. Morgan, Judge**

**No. W2012-02729-CCA-R3-CD  - Filed January 28, 2014**

The defendant, Jerry Crawford, Jr., appeals his Madison County Circuit Court jury conviction of aggravated robbery, challenging the sufficiency of the evidence and the length of his sentence.  In addition, the defendant claims that the prosecutor committed misconduct by impermissibly shifting the burden of proof to the defense during closing argument. Discerning no reversible error, we affirm the conviction.  Because the trial court improperly classified the defendant as a career offender, the sentence imposed is vacated, and the case is remanded for resentencing.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed in Part;**
**Vacated and Remanded in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., joined.

George Morton Googe, District Public Defender, and Jeremy B. Epperson, Assistant District Public Defender, for the appellant, Jerry Crawford, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Jerry Woodall, District Attorney General; and Jody Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In December 2011, the Madison County grand jury charged the defendant with one count of aggravated robbery.  The trial court conducted a jury trial in October 2012.

At trial, Jane Long testified that, in November 2010, she was employed as a manager at the Circle K convenience store ("the store") on the Highway 45 Bypass in

Jackson, where she worked the third, or "graveyard," shift from 10:00 p.m. until 6:00 a.m. On November 6, 2010, Ms. Long was working alone at the store when a customer entered at approximately 1:50 a.m. Ms. Long, who had been stocking a cooler, proceeded to the cash register to wait on the customer. When she asked if she could assist him, the customer handed her a note which read, "I have a gun pointed at you." Ms. Long immediately opened the cash register drawer and began handing him cash from the drawer. Ms. Long testified that no handgun was visible but that the robber "had his hand in his [jacket] pocket," which Ms. Long "believed was the gun." Ms. Long further explained that the robber was waving this hand around while it was still in his pocket, and she heard the sound of something metallic hitting the metal cash register. Ms. Long believed that the sound she heard was that of a handgun striking the cash register. Ms. Long affirmed that she was fearful of being shot or killed.

Ms. Long gave the robber the cash from the register drawer, which she recalled amounted to "probably a ten, a fi[v]e and some ones," and the robber stated, "B****, I know you got more f***** money than this." Ms. Long then opened the second cash register, and as she was removing cash from the drawer, the robber stated, "B****, I'll kill you." Before Ms. Long could hand the robber the cash from the second drawer, the robber requested three cartons of cigarettes. Ms. Long handed the cash to him, totaling approximately $150 between the two registers, and the man left the store with the cash but without the cigarettes. Ms. Long testified that she immediately locked the door and called the police.

Ms. Long affirmed that the store was equipped with video surveillance equipment, and, through her testimony, the State introduced into evidence surveillance footage from the early morning hours of November 6, 2010, which showed the robbery unfold as Ms. Long had previously described. At 1:50:40 a.m., a black man entered the store, and Ms. Long identified for the court the man in the video as the defendant. Ms. Long also identified the handwritten note that the robber handed to her, which read "My gun is pointed at you. Give me the money."

On November 10, 2010, an investigator with the Jackson Police Department ("JPD") showed Ms. Long a photographic lineup, from which Ms. Long identified the defendant as the man who robbed the store.

On cross-examination, Ms. Long admitted that, prior to November 6, she had never seen the defendant. With respect to the photographic lineup, Ms. Long testified that she "didn't even have to hesitate" and said, "As soon as [the investigator] handed [the lineup] to me, soon as she showed me, I said 'That's him right there.'" Ms. Long explained that, once the robber left the store, she "was really freaked out." She retrieved her cellular telephone and called another store manager to ask for the telephone number of the police

department.  Before the store manager could answer, Ms. Long realized that she needed to call 911, so she ended the call and then called 911 from the store telephone.

JPD Officer Thomas Brea testified that, in the early morning hours of November 6, 2010, he responded to a call of an aggravated robbery at the store.  When he arrived, Ms. Long advised him that the robber had handed her a note, which Officer Brea collected and sealed inside an evidence bag.  Officer Brea identified the note for the jury.

On cross-examination, Officer Brea confirmed that the note was folded and lying on the store counter when he arrived at the scene.

Deputy Lashunda Perry with the Madison County Sheriff's Department ("MCSD") identified a criminal fingerprint card, which contained all of the defendant's fingerprints.

William L. Roane, a forensic latent print examiner with the JPD, testified as an expert.  Mr. Roane testified that he had examined the note recovered from the store for fingerprints.  Once he had identified six "prints of value," he ran one of the fingerprints through the Federal Bureau of Investigation's "AFIS" system and was able to determine that the fingerprint belonged to the defendant.  Mr. Roane was later able to compare the defendant's fingerprints on the criminal fingerprint card on file with the MCSD with those found on the note, and he was able to identify three of the defendant's fingerprints on the note, which included the print identified through AFIS.

On cross-examination, Mr. Roane acknowledged that three fingerprints and one palm print on the note did not belong to the defendant, and he was unable to determine the origin of those prints.

JPD Investigator Susan Cole testified that the defendant became a suspect in the aggravated robbery of the store following the discovery of the defendant's fingerprints on the robbery note.  Investigator Cole prepared a photographic lineup, which included the defendant's photograph, and, on November 10, she showed it to Ms. Long, who positively identified the defendant as the robber.

Lieutenant Shannon Hughes with the Crockett County Sheriff's Department ("CCSD") testified that, on November 28, 2010, she was working at the Crockett County jail, and she allowed the defendant to make a telephone call.  Lieutenant Hughes stood approximately eight to 10 feet from the defendant while he was making his call, and she was able to overhear portions of his conversation.  Lieutenant Hughes testified that, to the best of her recollection, the defendant stated "to the other party something about getting a letter,

and if they would do what was asked in that letter, he would be coming home pretty soon." An audio recording of the defendant's telephone conversation was entered into evidence, in which the defendant is overheard making the aforementioned statement. Lieutenant Hughes stated that this statement by the defendant "raise[d] a flag," and Lieutenant Hughes recalled that the defendant had written a letter earlier that same day.

CCSD Deputy Wes McGullion testified that he was working in the Crockett County jail on November 28 and that Lieutenant Hughes informed him of a potential situation involving the defendant. Deputy McGullion listened to the audio recording of the defendant's telephone conversation, and he recalled that the defendant said "something to the effect of, 'when you get these letters, tear them up, you know. If you do this for me, babe, I'll be out of here.'" Deputy McGullion also recalled the defendant's making a statement about "taking the charge" for him. After listening to this recording, Deputy McGullion retrieved two letters written by the defendant and delivered them to Lieutenant Penny Curtis. Deputy McGullion identified the first letter from the defendant as addressed to Dominique Mitchell and the second letter addressed to Erika Brooks, purporting to be from the defendant's alias, Jerry Fenner.

CCSD Lieutenant Penny Curtis testified that she was in charge of the criminal investigations division. She testified that she was familiar with the defendant, and, from a series of still photographs taken from the store's video surveillance footage, she identified the defendant as the robber of the store. Lieutenant Curtis also identified a kelly green sedan with the word "Celtics" printed on the passenger side doors, which was visible in front of the store moments before the defendant entered, as owned by Dominique Mitchell, the defendant's girlfriend. With respect to the recorded telephone conversation at the Crockett County jail, Lieutenant Curtis identified the voices on the recording as those of the defendant, Dominique Mitchell, and Erika Brooks.

Lieutenant Curtis identified the letter written by the defendant to Dominique Mitchell, which contained three pages. The first page was a copy of the defendant's arrest warrant, which contained a narrative of the robbery of the store and a handwritten note below the narrative stating, "This is what happened," with a line and arrow pointing to the affidavit. At the bottom of the page, another handwritten note stated, "Baby call this person," with an arrow connecting the name of Investigator Cole and her telephone number. The second page, which was entirely handwritten in pencil, stated as follows:

> Baby I got three charges in all one in Gibson, one in Crockett
> and that robbery in Jackson. That's the one I can't shake. Since
> you're only 17 I need you to really represent for me and take that
> charge at that store.

-4-

By you being only 17 they will take you to the [Juvenile] Court in Jackson and they will take the charge off me and give it to you. Now Baby they will try everything in their power to say you are protecting me, and they will say they know for a fact that it was me cause they got my finger prints, and the lady (white lady) at the store did a photo line-up and picked me out of the group. Now when they say this – This is what you say . . . I took the sheet of note book paper off his moms table and I wrote I have a gun pointed at you give me the money b[****]. That how his prints was on it and thats how it happen. I walked in the Circle K store around four that morning and I waited for the lady to come up from the back of the store and I said I have a note for you, and she read it and gave me about $150.00 one hundred and fifty dollars and I walked out the store heading towards the back and begin to run, thats when I got away. If they ask you had on a Army colored hat that fit around your whole head, and you had my black coat on with some white jogging pants with the red stripes going down the side with some white and blue Js. Baby I got Gibson and Crockett beat. I just need you to do this one. See Baby Jackson wants me bad so you needs to convince them that it was really you. They may ask if you know me say yes. They may even say they will bound you over but I swear don't believe it. You are about to be 18. They can't do nothing they may even say you will get ten years cause of this but baby everything I be saying comes true right so if I know you like I do then you got this for me right,??? I love you. Just call the Jackson Police Dept. and tell them, #425-8400. If they ask what store, you know where Big K Mart is – it's the store right across the street from it at the corner. When you tell them this keep the same story and they gots to let me go, and you will be on probation til you turn 18. We will back together like always. I love you, sorry so [illegible] sleepy. Tell them you went in looking like a boy cause you knew you would get away with it.

The third page, again handwritten in pencil, primarily contains statements by the defendant professing his love for Ms. Mitchell but, in the middle of the page, the defendant tells Ms. Mitchell that, "I need you, and I feel in (call investigator S. Cole 425-8400 and that all you need to tell) my heart that you will go to Jackson and tell the investigator S. Cole what happen that's why I put the paper of what happen in there so you'll know." The back of the

-5-

second page contains a short, handwritten love letter in black ink, signed "Jerry." A fourth page contains a short, handwritten note in pencil, entitled, "To my love on our wedding day," signed by "Jerry Fenner."

The second letter, contained in an envelope addressed to "Erica Brooks"[1] but written to Ms. Mitchell, is handwritten in black ink:

Hello Baby Girl how are you? I'm not doing so good, cause I miss you so so much and it kills me inside to not be there. I can't wait til we are back together. I herd you and Erica came up here today. I was so upset I couldn't see you. But on that biz that you're gonna do for me will get us back together next month. I got the charge here beat in Alamo, and Humboldt, but you gotta take the one in Jackson. When you go there look like a tomboy have a hat on some big pants and that black coat.

They will try their best to say you are lying for me, but keep saying I'm not lying I did it and they will be like well how did Mr. Crawford prints get on the note that said give me the money my gun is pointed at you. You will say we was over his moms house playing cards and he was keeping the score and thats how it got on there. The next question they may ask is, well the clerk at the store saw his face and pointed him out. Then you say she is lying it was me, she couldn't see my face cause I had a Army hat covered half of my face.

By this time the investigator will be mad as hell cause they want me bad and you come in and f[***] s[***] up, so this is the point where he will start lying. . . saying things like so you're willing to go down for him? You say I'm not going down for no one, I did it. Then he will say why did you do it? You say cause my Grandmom told me I have 37 hours to get out of her house and I was sleeping in my car, so I had no choice. Then he might say something like . . . well if I charge you with this, you will be facing twenty years or some shit like that. He trying to spook you into saying it was me. Whatever he say just keep your story and don't change it for nothing. This is whats really about it

---

[1]The defendant employs the spelling "Erica," whereas the transcript reflects that Ms. Brooks' first name is spelled "Erika."

make them mad . . . when they ask how old are you and you say 17 he will be like damn, Jerry is smart that's why she's doing this cause she knows we can only hold her until she's 18 and they both will be free. (f[***]) Thats what he will say. But before he breaks down and realizes that you're not giving in he will try one last scare tatic [sic] which is well we will bound you over as an adult and you'll hate you took the charge. Then you say I did the crime so I gotta do the time right. He'll say you're f[******] right about that.

After a few more paragraphs in which the defendant gloats that law enforcement officials will bemoan the fact that "Jerry done got away" and that the defendant and Ms. Mitchell orchestrated "some bonnie and clyde type" of activity, the defendant warns Ms. Mitchell that the prison officials "read our letters so don't say nothing. Talk in codes." The letter then continues with more statements of the defendant's love for Ms. Mitchell and a request that Ms. Mitchell retrieve a wedding ring "from [B]uddies on Highland and put it on your finger." Before ending the letter, the defendant once again instructs Ms. Mitchell to "call Jackson and tell them you wanna confess to something and I'll be on my way home."

Dominique Mitchell testified that she was 17 years of age in November 2010 and that she was, at that time, in a romantic relationship with the defendant. Ms. Mitchell confirmed that she resided with her grandmother in November 2010 and that the letter the defendant had written to her from jail was addressed to her at her grandmother's address, although she never actually received that letter. Ms. Mitchell also confirmed that she and the defendant were friends with Erika Brooks. Ms. Mitchell reviewed a still photograph taken from the video surveillance at the store on the night of the robbery and admitted that the green sedan emblazoned with the word "Celtics" that was visible in front of the store was, in fact, her vehicle. Ms. Mitchell also reviewed two still photographs that showed the robber entering the store on the morning of November 6, and Ms. Mitchell identified the defendant as the man in those photographs. With respect to the defendant's time in jail in November 2010, Ms. Mitchell testified that she received a "multitude" of telephone calls from the defendant from jail in which he asked her if she was "still gonna do it for him," which she acknowledged referred to his requests that she admit to perpetrating the robbery.

On cross-examination, Ms. Mitchell admitted that, when she initially spoke with someone from the JPD, she denied that the defendant had possession of her car on the morning of the robbery. Ms. Mitchell acknowledged that she later visited the JPD and admitted that the defendant "had [her] car on November the 6th."

Erika Brooks testified that she was familiar with the defendant through his

relationship with Ms. Mitchell. Ms. Brooks admitted that the letter the defendant attempted to send her from jail was properly addressed to her at her residence in November 2010. Ms. Brooks also reviewed the photograph of the green sedan that was visible outside of the store on November 6 and confirmed that the vehicle was owned by Ms. Mitchell but that Ms. Mitchell allowed the defendant to drive it.

With this evidence, the State rested its case. Following a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected to testify.

The defendant testified that his name was Jerry Crawford, Jr. but that he sometimes used the name Jerry Fenner because Fenner was his Father's surname. The defendant admitted that he had been convicted of "several" crimes in the past, including multiple burglary, theft, and vandalism convictions in the counties of Madison, Chester, Crockett, Gibson, Hardeman, Carroll, Dyer, and Henderson, following a 2003 "crime spree."

The defendant stated that he was familiar with Ms. Long, the store manager, because "she buys pills from me." The defendant testified that he had met Ms. Long in mid-October 2010 when he was standing outside a store in Jackson "smoking a blunt." The defendant stated that Ms. Long approached him and inquired about purchasing some pills. The defendant sold her five Xanax pills for five dollars apiece. At Ms. Long's request, the defendant provided her with his telephone number, and Ms. Long contacted him periodically to purchase more pills.

With respect to the events of November 6, the defendant claimed that Ms. Long contacted him at approximately 10:00 p.m. on November 5 and requested some pills "on credit." The defendant explained that he could not comply because he had to have money to feed his children and because Ms. Long had not paid for pills that she had previously purchased on credit. Ms. Long called back two hours later and told the defendant that she "got a way that you can get paid and get a little bit extra on top." The defendant was intrigued, and he testified that the following telephone conversation ensued:

> [Ms. Long] said, "Well, you'll have to come in and act like you're robbing me." I said, "Well I can't rob you, I don't have a gun." She said, "You ain't got to have a gun. Just hold your hand in your pocket and make it look like it." I said, "Okay, I can do that." She said, "When you come, make sure you have – you bring those pills." I said, "Okay. What you want me to do this, sit them on the floor or something when I'm heading out the door?" She was like, "No, just put them in a piece of paper." She said, "Better yet, just write a note or something and

make a note and put on there like 'This is a stickup' or you gotta gun. Just put something on there, that way you can put the pills in there and you can hide that from the camera, and on top of that, I'll be explain [sic] to the police that I was being held up."
I was like "Okay."

The defendant described the Xanax pills as "the size of a rice grain." The defendant testified that Ms. Long called him around "1 something" on November 6 and told him to come to the store. The defendant, who resided close by, proceeded to the store in the "green Boston Celtics Crown Victoria." The defense attorney then played the video surveillance footage, and the defendant identified himself entering the store. The defendant stated that the only item in his pockets was the folded note containing the pills that he intended to give Ms. Long. The defendant claimed that Ms. Long did not completely unfold the note when he handed it to her because "she already knew what it said." The defendant denied that he had a gun in his pocket, claiming instead that it was only his left hand and that he was "acting like [he was] pointing something at her." The defendant recalled that he did call Ms. Long a "b[****]" to "make it look real."

The defendant testified that, approximately five seconds after he left the store, Ms. Long called his cellular telephone to inquire whether the defendant had managed to leave the parking lot next to the store. When the defendant replied that he had, Ms. Long told him she was going to contact the police but promised him "that she would make sure [he] got away before she called the police." The defendant stated that he recognized the number because Ms. Long had called him about "20 times" and that he would "never forget that number."

The defendant admitted that he had contacted Ms. Mitchell following his arrest in an attempt to convince her to confess to the robbery. He stated that he "should have never did that, and I'm glad that she never received any of them letters because it's not fair for her to go down for something that I did, me and [Ms. Long] did." The defendant denied that he received $150 from the store's cash registers, claiming that Ms. Long gave him only $63.

The defendant testified that he was never interrogated about the robbery and that he was never given a chance to explain his story to law enforcement officers.

On cross-examination, the defendant admitted that he had received a copy of the indictment, which contained both Ms. Long's name and her cellular telephone number, although he later claimed that he had never received a copy of the indictment which contained Ms. Long's telephone number. When asked if he had ever told any law enforcement officers about Ms. Long's involvement in the robbery, the defendant responded

-9-

that "they never came and talked to [him]." The defendant admitted that he had attempted to convince Ms. Mitchell to confess to the crime and that he was "not above having people come in here and lie to a jury of 12 of your peers."

Based on this evidence, the jury convicted the defendant as charged of aggravated robbery. Following a sentencing hearing, the trial court imposed a sentence of 30 years, to be served consecutively to the defendant's sentence in a Crockett County case. Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the evidence adduced at trial was insufficient to support his conviction, that the prosecutor committed misconduct by impermissibly shifting the burden of proof to the defendant during closing argument, and that the sentence imposed was excessive. We consider each claim in turn.

*I. Sufficiency*

The defendant first contends that the evidence is insufficient to support his conviction of aggravated robbery. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon . . . or . . . [w]here the victim suffers serious bodily injury." *Id.* § 39-13-402(a).

Here, the proof adduced at trial established that the defendant, driving a unique and very recognizable bright green "Celtics" sedan, entered the store just before 2:00 a.m. on November 6 and handed the store manager a handwritten note stating, "My gun is pointed at you. Give me the money." The defendant kept his left hand inside his jacket pocket with his finger pointed to resemble a handgun. Ms. Long testified that the defendant waved his left hand while it was still encased in his jacket pocket and that she heard the sound of something metallic striking the cash register, which furthered her belief that the defendant possessed a weapon. Ms. Long gave the defendant the cash from the two cash registers, which she testified totaled approximately $150. While she was retrieving the money, the defendant threatened to kill her, and Ms. Long was afraid that the defendant would shoot or kill her. A few days after the robbery, Ms. Long instantaneously identified the defendant from a photographic lineup, and the defendant's fingerprints were found on the note handed to Ms. Long. The defendant's girlfriend, Ms. Mitchell, positively identified the defendant as the robber shown in the store's video surveillance footage, and Ms. Mitchell and Ms. Brooks positively identified Ms. Mitchell's green sedan as the vehicle seen driving past the store just moments before the defendant entered the store and committed the robbery. Through Lieutenant Curtis, the State introduced into evidence two letters written by the defendant to Ms. Mitchell, in which the defendant repeatedly urged Ms. Mitchell to confess to the robbery and in which the defendant outlined, in explicit detail, the way in which the robbery had been committed. The defendant himself admitted at trial that he had committed the robbery; he merely took exception with the manner in which it was committed. The jury heard this testimony and rejected it, as was their prerogative.

This court can scarcely conceive of a case in which the evidence of the defendant's crime is more sufficient. Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence overwhelmingly supports the defendant's conviction of aggravated robbery.

## II. Prosecutorial Misconduct

Next, the defendant argues that the prosecutor committed misconduct during closing argument by impermissibly shifting the burden of proof to the defense. The prosecutor, in the rebuttal portion of his closing argument, referenced the alleged telephone call that Ms. Long made to the defendant following the robbery, stating that "Mr. Epperson doesn't produce any phone records saying she had called the Defendant. None of that."

Despite the discretion afforded trial courts in determining the propriety of closing argument, judges must nevertheless take care to restrict improper argument. *State v. Hill*, 333 S.W.3d 106, 130-131 (Tenn. Crim. App. 2010) (citing *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). Because of the State's unique role in a

criminal case, the State, in particular, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Hill*, 333 S.W.3d at 131. We have consistently held that closing argument for both parties "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *Id.* (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). Even inappropriate closing argument will not warrant a new trial unless it was so inflammatory or improper as to affect the verdict. *Hill*, 333 S.W.2d at 131 (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (1965)). An appellate court considering the propriety of closing argument examines the following factors:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
> (2) [t]he curative measures undertaken by the court and the prosecution[;]
> (3) [t]he intent of the prosecutor in making the improper statements[;]
> (4) [t]he cumulative effect of the improper conduct and any other errors in the record [; and]
> (5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The defendant did not lodge a contemporaneous objection to the remarks he now challenges on appeal. Thus, to be entitled to relief, he must establish not only that the remarks were improper but also that they rose to the level of plain error. *State v. Gann*, 251 S.W.3d 446, 458 (Tenn. Crim. App. 2007) (holding that defendant's failure to lodge a contemporaneous objection during challenged closing argument waived plenary review of the issue and left only plain error review).

Before an error may be recognized as plain, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Olano*, 507 U.S. 725, 732 (1993) (citations omitted).

In *State v. Smith*, our supreme court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

"(a) the record must clearly establish what occurred in the trial

court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

Applying these factors to the instant case, we note that, in viewing the conduct of the prosecutor in the context of the closing arguments, the prosecutor's singular statement about the defense's failure to produce telephone records was improper, and no curative measures were undertaken. That being said, we discern no malice in the prosecutor's statements, and the cumulative effect of the conduct was fleeting, comprising a single statement. Most importantly, the State's case against the defendant was extremely strong, given, as discussed previously, the considerable evidence of the defendant's guilt.

Taking all of these factors together, we hold that the argument, if improper, was not plain on the record in that noticing an error is not necessary to assure substantial justice.

### III. Sentencing

Finally, the defendant claims that the trial court erred by sentencing him as a career offender because the 24-hour-merger rule reduced the number of his felony convictions below that necessary to establish career offender status. *See* T.C.A. § 40-35-108(b)(4). The State concedes that the defendant was improperly classified as a career offender but contends that the error was due to the defendant's lack of Class A, B, or C felony convictions rather than the 24-hour-merger rule.

"[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act

"effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.*

In the instant case, the jury convicted the defendant of aggravated robbery, a Class B felony. The presentence investigation report established that the 28-year-old defendant had 23 Class D and seven Class E felony convictions. Tennessee Code Annotated section 40-35-108 provides, in pertinent part, as follows:

> (a) A career offender is a defendant who has received:
>
> (1) Any combination of six (6) or more Class A, B or C prior felony convictions, and the defendant's conviction offense is a Class A, B or C felony;
>
> (2) At least three (3) Class A or any combination of four (4) Class A or Class B felony convictions if the defendant's conviction offense is a Class A or B felony; or
>
> (3) At least six (6) prior felony convictions of any classification if the defendant's conviction offense is a Class D or E felony.

T.C.A. § 40-35-108(a). With no prior Class A, B, or C felony convictions, the defendant did not qualify as a career offender for purposes of his Class B aggravated robbery conviction. As to this conviction, the defendant is a Range III, persistent offender. *See* T.C.A. § 40-35-107(a)(1) ("A persistent offender is a defendant who has received . . . [a]ny combination of five (5) or more prior felony convictions within the conviction class or higher or within the next two (2) lower felony classes . . . ."). Accordingly, we remand the case for resentencing.

## *IV. Conclusion*

The evidence adduced at trial was sufficient to support the defendant's conviction of aggravated robbery, and the prosecutor's statements during closing argument do not amount to reversible error. Because the trial court improperly classified the defendant as a career offender, we remand the case to the trial court for resentencing.

_____

JAMES CURWOOD WITT, JR., JUDGE