IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 22, 2017 Session

**STATE OF TENNESSEE v. CHARLES EDWARD DAY**

**Appeal from the Circuit Court for Anderson County**
**No. B2C00571     Donald R. Elledge, Judge**

_____

**No. E2016-00632-CCA-R3-CD**

_____

The defendant, Charles Edward Day, appeals his Anderson County Circuit Court jury conviction of reckless aggravated assault, claiming that the trial court erred by admitting certain evidence at trial, that the State committed prosecutorial misconduct during closing argument, that the evidence was insufficient to support his conviction, that the sentence imposed was excessive, and that the cumulative effect of these errors prevented him from receiving a fair trial.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Tom Marshall, Assistant District Public Defender, for the appellant, Charles Edward Day.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Dave S. Clark, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Anderson County Grand Jury charged the defendant with one count of the aggravated assault of the victim, Toni Roberts.  The trial court conducted a jury trial in March 2015.

The State's proof at trial established that the victim was working as a registered nurse in the Intensive Care Unit ("ICU") of Methodist Medical Center ("MMC") on the night of June 8, 2012.  On that date, the defendant was an ICU patient at MMC.  At some point that evening, the victim saw the defendant loudly arguing with his

ICU nurse, Alexander Pierce; the victim was unsure, but she believed that the defendant was wearing restraints during the argument. Mr. Pierce recalled that the defendant had experienced periods of agitation and restlessness earlier in the evening. Shortly before midnight, the victim observed the defendant standing by his hospital bed and attempting to free himself from his wrist restraints. The victim informed Mr. Pierce of the situation, and Mr. Pierce entered the defendant's hospital room to instruct the defendant to return to the bed. Mr. Pierce testified that, despite the defendant's agitation, the two were still able to communicate clearly, and he stated that the defendant understood the directions he was given. During this time period, the victim "heard some commotion and some cussing and some struggling," and she and other nurses, including Katherine McDowell, entered the room to assist. Ms. McDowell recalled that the defendant was behaving "[v]ery aggressive[ly]."

Because the defendant had managed to position his entire body near the foot of the bed, Mr. Pierce and Ms. McDowell attempted to reposition the defendant while the victim stood at the foot of the bed as "backup." The defendant was "cussing, threatening, [and] saying obnoxious things to everyone" during this process. As soon as the defendant's wrist restraints were removed to reposition him, the defendant, while jerking his arms back and forth, lifted his legs, looked the victim "dead in the eye," and kicked her below her chin. Both Mr. Pierce and Ms. McDowell witnessed the defendant's kicking the victim in the face. The force of the impact caused the victim's body to go airborne, and she landed on her left side 15 to 20 feet away near the nurses' station. She immediately experienced "excruciating pain" in her hip, pelvic area, and legs before her legs "went numb." At that point, she believed that she was paralyzed. Unable to stand, she was transferred to a wheelchair and taken to the emergency department. The victim saw a specialist for her injuries and was out of work for four months before returning on light duty for two months.

Mr. Pierce confirmed that ankle restraints were not placed on the defendant until after he had kicked the victim, and Ms. McDowell testified that she overheard the defendant say that he "wasn't meaning to kick [the victim]" but he "was trying to kick that big guy."

Officer Max Smith testified that, on June 9, 2012, he was working for the Oak Ridge Police Department when he was dispatched to MMC shortly after midnight to investigate an assault. Officer Smith observed the victim in the emergency department and saw that she was "physically shaken" and "emotionally disturbed." When Officer Smith visited the defendant in his ICU room, he asked the defendant what had happened, and the defendant responded that "he had done something bad," that he "thought it was a man and not a woman," and that "he hope[d] she's okay." Officer Smith testified that the defendant seemed "sleepy" but that he had no trouble communicating with him. On cross

examination, Officer Smith conceded that he saw no visible physical injuries to the victim.

Doctor Michael O'Brien, an orthopedic surgeon, testified as an expert witness in the field of orthopedic surgery and orthopedics. Doctor O'Brien treated the victim following her injury and ordered two magnetic resonance imaging ("MRI") tests. His review of the MRIs revealed that the victim's pelvis was broken in three places and that her abductor tendon was torn. Doctor O'Brien stated that such injuries are "usually quite painful" and cause difficulty in walking and sleeping. With respect to her recovery time, Doctor O'Brien testified that the victim's bones had healed by December 2012 but that she was still experiencing residual pain. Doctor O'Brien described the injury as "serious" and stated that it was "consistent" with the victim's description of the defendant's assault. Doctor O'Brien conceded that the victim was suffering from osteoporosis at the time of her injury, which would cause her to be more susceptible to broken bones, but he stated that the osteoporosis would not have slowed the victim's healing process and would likely not have contributed to the victim's torn tendon.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, the defendant elected to testify and to put on proof.

Diane Day, the defendant's mother, testified that the defendant was taken to a Loudon County hospital in June 2012 following "an overdose" and that he was later transferred to the ICU at MMC. Ms. Day was "pretty sure" that she had visited the defendant on June 8 at 3:30 p.m. and that he was "not himself." When Ms. Day asked the defendant what he was doing that day, the defendant had responded that he was "just shopping here at Walmart picking up a few things for the girls." Ms. Day also believed that, based on his behavior, the defendant did not recognize her or other family members who visited him that day.

Sharon McClain, the defendant's fiancée, testified that she visited the defendant at 5:30 p.m. on June 8 and that he did not appear to recognize her.

The defendant testified that he had overdosed on Seroquel and Vicoplin. The defendant clarified that he had been prescribed Vicoplin but not Seroquel. The defendant testified that he recalled taking both medications and "walking over to the garbage can" on June 3 and that he recalled nothing until he awoke in the hospital on June 11. The defendant remembered nothing about his time in the ICU and did not recall kicking the victim. The defendant stated that he "was shocked" and "felt bad" when he learned what he had done because he "[doesn't] act like that."

- 3 -

Doctor Edgar Diaz, a hospitalist with MMC and Roane Medical Center, testified as an expert witness in the field of internal medicine and hospital medicine. Doctor Diaz first encountered the defendant on June 10 when the defendant was moved out of ICU to a regular hospital room. Doctor Diaz diagnosed the defendant as suffering from acute encephalopathy, which he defined as confusion or a lack of orientation "to self, to what time it is, to what day it is." To treat the defendant, Doctor Diaz prescribed Librium, a sedative typically used "to alleviate withdrawal symptoms," and Dilantin, an anti-seizure medication. Doctor Diaz discharged the defendant "two or three days" later, deeming him medically able to return home.

On cross-examination, Doctor Diaz acknowledged that the defendant's discharge summary from Loudon Medical Center indicated that the defendant's urine screen was positive for cocaine, marijuana, and opiates. Doctor Diaz agreed that the MMC discharge summary stated that the discharging physician "'after a thorough evaluation of patient and patient's history, did concur that the patient's symptomatology was most likely secondary to poly substance abuse, slash, overdose, slash, withdrawal.'" Doctor Diaz agreed that the summary indicated that the defendant's medical issues were due in part to an overdose and withdrawal from narcotics.

On redirect examination, Doctor Diaz stated that Seroquel was an anti-psychotic medication primarily used to treat bipolar disorder and that the defendant suffered from bipolar disorder. With respect to the symptoms of withdrawal following an overdose of Seroquel, Doctor Diaz opined that patients could be "very agitated, their heart rate can be high, [and] blood pressure would be high." Doctor Diaz also agreed that a patient experiencing withdrawal symptoms typically would be "resistant and hostile and combative" prior to receiving sedatives.

Based on this evidence, the jury convicted the defendant of the lesser included offense of reckless aggravated assault. Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to a term of four years' incarceration. Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant contends that the trial court erred by admitting certain evidence at trial, that the State committed prosecutorial misconduct during closing argument, that the evidence was insufficient to support his conviction, that the sentence imposed was excessive, and that the cumulative effect of these errors prevented him from receiving a fair trial. We will address each issue in turn.

*I. Admission of Witness Testimony*

The defendant first contends that the trial court erred by permitting Doctor Diaz to testify about the defendant's prior illegal drug use.

Outside the presence of the jury, the prosecutor questioned Doctor Diaz about the notes in his discharge summary, which indicated that the defendant's urine screen, upon his admission to MMC, was positive for cocaine, carotenoids, and opiates. Doctor Diaz confirmed that his evaluation of the defendant's history convinced him that the defendant's "symptomatology . . . was likely secondary to the poly substance abuse, overdose and withdrawal." At the conclusion of this testimony, the prosecutor argued that this testimony should come before the jury both as evidence of the defendant's voluntary intoxication and his lack of credibility in that he had failed to mention having taken cocaine and marijuana prior to his June 3 overdose. Defense counsel responded that such testimony was improper evidence of prior bad acts under Tennessee Rule of Evidence 404(b). The trial court ruled as follows:

> [The defendant] said he took two medications; one with prescription and one without. Nowhere did he mention [c]ocaine or cannabis, nowhere. And, to me, especially when he's up here and we have testimony of statements that he has made that he didn't mean to kick the woman, he was trying to kick the man and the knowledge. And then when he testifies that he doesn't remember anything about this and he testifies that he had a prescription for one of these drugs and said that to the trier of fact and just happens to omit the fact that he says [c]ocaine and cannabis. I think that strongly goes to the issue of credibility. Strongly goes to the issue. Because the witnesses that we have in support of him [are] his mother and his fiancé[e]. And the jury will take whatever decision that they believe is appropriate based upon the relationship that they have and their own ability to observe their testimony and how they testify and what they said. But specifically as it pertains to the defendant, what he testified to this [c]ourt is inconsistent with what his medical records show, by his own expert.
>
> . . . .
>
> The drugs that [the defendant] testified he took I didn't even hear mentioned from your expert. I didn't hear him

- 5 -

mention either of those drugs that he said he had and one of which he said he had a prescription for. So there's a huge issue of credibility that I think is important for the jury. I really do. I will overrule your objection. I will allow the questions as asked. It bothers the [c]ourt because it boils down to an issue of credibility with the jury. What your client has said under oath as the defendant, his mother and his fiancée. And whether he did or didn't remember anything, whether he knew or didn't know what he was doing. And when he testifies, yeah, I took this and that's the last thing I remember. And didn't even mention any of these drugs and the doctor hasn't even mentioned any of the two that he testified to. That bothers the [c]ourt. So it's his day in court, it's his expert witness.

When the jury returned to the courtroom, Doctor Diaz testified as he had during the jury-out hearing.

On appeal, the defendant argues that this prior bad act evidence was admissible through one of two avenues, either through Tennessee Rule of Evidence 608(b) or Rule 404(b), and that the evidence at issue did not qualify for admission under either rule.[1] The State responds that the evidence was properly admitted for impeachment under Rule 608(b) and that, in any event, the evidence at issue was probative of the defendant's motive and intent under Rule 404(b).

---

[1]     In circumscribing the issue of admitting the testimony in question, the defendant did not mention fact contradiction as a theory for admission, and the State did not advance such a theory in support of admission. We note, however, that the trial court articulated the defendant's credibility as the target for Doctor Diaz's testimony. The court's language bespeaks contradiction of fact as the operative mechanism for impeachment of the defendant. "Through fact contradiction, a cross-examining party inquires about facts that conflict with the witness's testimony to show indirectly that the witness is untruthful." *State v. Jeremy Sims and Sherry Brookshire*, No. W2013-01253-CCA-R3-CD, slip op. at 20 (Tenn. Crim. App., Jackson, Sept. 25, 2015). Fact contradiction is a long-standing impeachment device that is indigenous to cross-examination and enjoys implied currency in our rules of evidence; it emanates simply from the power to attack a witness's credibility as expressed in Tennessee Rule of Evidence 607. *Id.*; *see* Neil P. Cohen et al., Tennessee Law of Evidence § 6.07[4][a] (6th ed. 2011). An obvious problem in using a fact-contradiction theory is that the defendant did not testify that he did not use cocaine or marijuana prior to the overdose on June 3; rather, the trial court was bothered merely by the defendant's failure to acknowledge this drug usage. The trial court apparently believed that evidence of this drug usage contradicted the defendant's omission of fact. We are not convinced that this situation justified admission of the evidence as a matter of fact contradiction. At any rate, this avenue to impeachment was not raised by the parties on appeal, and we determine that any such claim is waived.

- 6 -

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury's convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005).

Notwithstanding the general rule, evidence of a defendant's prior crimes, wrongs, or acts may be admissible when it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Thus, evidence of a defendant's character may become admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. *Id.*; *Thacker*, 164 S.W.3d at 239. To admit such evidence, the rule specifies four prerequisites:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine whether that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

In reviewing a trial court's decision to admit or exclude evidence under Rule 404, an appellate court may disturb the trial court's ruling only if there has been an abuse of discretion. *Thacker*, 164 S.W.3d at 240. The trial court's determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *See State v. DuBose*, 953 S.W.2d 649,652 (Tenn. 1997). If, however, the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *Id.*

Tennessee Rule of Evidence 608 provides, in pertinent part, as follows:

Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;

(2) The conduct must have occurred no more than ten years before commencement of the action or prosecution, but evidence of a specific instance of conduct not qualifying under this paragraph (2) is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conduct before trial, and the court upon request must determine that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify

> at the trial to later challenge the propriety of the determination.
>
> The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the witness's privilege against self-incrimination when examined with respect to matters which relate only to character for truthfulness.

Tenn. R. Evid. 608(b).

In the instant case, the trial court, although finding that the evidence of the defendant's use of cocaine and marijuana prior to his June 3 overdose was admissible on the issue of credibility, failed to find that the probative value of the evidence outweighed the danger of unfair prejudice. Moreover, the State failed to give the defendant pretrial written notice of its intent to use the evidence, and the issue was not, as required by Rule 608, addressed "prior to the testimony of the accused." Tenn. R. Evid. 608(b)(3). In fact, the defendant was never asked if he had taken any additional drugs prior to his June 3 overdose. Finally, and perhaps most importantly, extrinsic evidence of the defendant's drug use offered through the testimony of Doctor Diaz was clearly inadmissible under Rule 608. Because the conditions of Rule 608 were not satisfied, the evidence of the defendant's cocaine and marijuana use was not properly admitted as impeachment evidence under that rule.

With respect to admission of the drug evidence under Rule 404(b), credibility is not one of the identified "other purposes" in the rule. *See* Tenn. R. Evid. 404(b); *Thacker*, 164 S.W.3d at 239-40. Furthermore, the trial court failed to make the requisite finding that the evidence of the defendant's illegal drug use was "clear and convincing." Tenn. R. Evid. 404(b)(3). The requirements of Rule 404(b), like those of Rule 608(b), were therefore not substantially observed, and the trial court abused its discretion in admitting into evidence Doctor Diaz's testimony regarding the presence of cocaine and marijuana in the defendant's system.

That said, considering the defendant's claim of voluntary intoxication and lack of awareness or memory of inflicting the assault, the admission of this evidence of *additional* drug use was just as likely to have influenced the jury's decision to convict the defendant of the lesser included offense of reckless aggravated assault, and given the substantial proof of the defendant's guilt, as will be discussed more fully herein, any error attendant to the admission of this evidence was harmless. *See* Tenn. R. App. P. 36(b).

## II.  Prosecutorial Misconduct

The defendant next contends that the prosecutor committed misconduct during closing argument by stating that an acquittal of the defendant "would have the effect of shutting the courtroom down."  The State responds that the prosecutor was simply "emphasiz[ing] the self-serving and flimsy quality of the defendant's claim of memory loss."

During closing argument, the prosecutor made the following statements:

> You know, just because [the defendant] doesn't remember doesn't mean that he's not guilty.  If the defense of "I don't remember" was a good defense, we could shut this courtroom down because from this day forward it's "I just don't remember."  That's not a defense.  The defense is what happened and what was the proof.

At that point, defense counsel requested a bench conference, whereupon he objected to the prosecutor's use of the phrase "shut this courtroom down."  The prosecutor responded that he was merely arguing that such a lack of memory in defendants "would mitigate the entire justice system."  The trial court noted but overruled the defendant's objection, and closing arguments continued without further objection.

Despite the discretion afforded trial courts in determining the propriety of closing argument, judges must nevertheless take care to restrict improper argument.  *State v. Hill*, 333 S.W.3d 106, 130-31 (Tenn. Crim. App. 2010) (citing *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)).  Because of the State's unique role in a criminal case, the State, in particular, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial."  *Hill*, 333 S.W.3d at 131.  We have consistently held that closing argument for both parties "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'"  *Id.* (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)).  Even inappropriate closing argument will not warrant a new trial unless it was so inflammatory or improper as to affect the verdict.  *Hill*, 333 S.W.2d at 131 (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (1965)).  An appellate court considering the propriety of closing argument examines the following factors:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
>
> (2) [t]he curative measures undertaken by the court and the

prosecution[;]

(3) [t]he intent of the prosecutor in making the improper
statements[;]

(4) [t]he cumulative effect of the improper conduct and any
other errors in the record [; and]

(5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Applying these factors to the instant case, we conclude that, in viewing the conduct of the prosecutor in the context of the closing arguments, the prosecutor was not, as advanced by the defendant, improperly "injecting issues broader than the guilt or innocence of the accused under the controlling law," *see State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003); rather, the prosecutor was simply commenting on the lack of weight that a defense based on lack of memory carries. With respect to curative measures, the trial court overruled the defendant's objection, finding that the prosecutor's argument was not inappropriate, thus obviating any need for curative measures, and the prosecutor made no further references to the defendant's lack of memory. The third factor, that of the prosecutor's intent, weighs in favor of the State. We discern no malice in the prosecutor's statements. The cumulative effect of the conduct was fleeting. Finally, when viewing the prosecutor's statement against the strength of the case, we conclude that the evidence against the defendant was extremely strong and that the issue forming the basis of the defendant's complaint was not a central part of the defense.

Taking all of these factors together, we find that the defendant has failed to demonstrate that the prosecutor engaged in any misconduct.

### III. Sufficiency

Next, the defendant asserts that the evidence adduced at trial is insufficient to support his conviction of reckless aggravated assault. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence,

or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"A person commits aggravated assault who . . . [r]ecklessly commits an assault as defined in § 39-13-101(a)(1), and the assault . . . [r]esults in serious bodily injury to another." T.C.A. § 39-13-102(a)(1)(B)(i). Code section 39-13-101(a)(1) provides that a "person commits assault who . . . [i]ntentionally, knowingly or recklessly causes bodily injury to another." *Id.* § 39-13-101(a)(1). "Serious bodily injury" includes "bodily injury that involves . . . [e]xtreme physical pain . . . [or] . . . [p]rotracted loss or substantial impairment of a function of a bodily member." *Id.* § 39-11-106(a)(34)(C), (E). Finally, "reckless" is defined as follows:

> [A] person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id.* § 39-11-106(a)(31).

Here, the proof adduced at trial established that the defendant, while being repositioned in his hospital bed, looked the victim directly in the eye, lifted both legs, and kicked her beneath her chin. The force of the impact caused the victim to go airborne and land on the floor outside the defendant's hospital room. The victim immediately felt "excruciating pain" and initially believed she had been paralyzed. Doctor O'Brien testified that the victim had broken her pelvis in three places and had torn her abductor tendon, injuries which are "usually quite painful." The victim was out of work for four months before returning to light duty for two months. Both Ms. McDowell and Officer

Smith testified that the defendant had stated that he had intended to kick the male nurse rather than the victim. Although the defendant denied remembering anything that had occurred during his time in the ICU, such matters of witness credibility and evidentiary weight are within the exclusive province of the trier of fact, and this court will not reweigh such evidence. *See Dorantes*, 331 S.W.3d at 379.

Viewing this evidence in the light most favorable to the prosecution, we hold that the evidence adduced at trial sufficiently established that the defendant was aware of but consciously disregarded the substantial and unjustifiable risk that the victim would be seriously injured. Accordingly, the evidence strongly supports the defendant's conviction of the lesser included offense of reckless aggravated assault.

## IV. Sentencing

Next, the defendant contends that the trial court abused its discretion by imposing the maximum available sentence. Again, we disagree.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The imposition of a four-year sentence in this case mandated the trial court's consideration of probation as a sentencing option. *See* T.C.A. § 40-35-303(a), (b). Traditionally, the defendant has borne the burden of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). Such a showing required the defendant to demonstrate that full probation would "'subserve the ends of justice and the best interest[s] of both the public and the defendant.'" *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (Tenn. 1956)), *overruled on other grounds by State v Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000). The supreme court later expanded

the holding in *Bise* to the trial court's decision regarding probation eligibility, ruling "that the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

When a trial court orders confinement and therefore rejects any form of alternative sentencing such as probation, split confinement, or periodic confinement, it must base the decision to confine the defendant upon the considerations set forth in Code section 40-35-103(1), which provides:

> (1) Sentences involving confinement should be based on the following considerations:
>
> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

*Id.*

At the conclusion of the sentencing hearing, the trial court issued its ruling from the bench, basing its decision on consideration of the evidence adduced at trial and at the sentencing hearing, the presentence report, evidence of enhancing and mitigating factors, and the defendant's potential for rehabilitation. The court determined that only one mitigating factor applied: "that the defendant, though guilty, committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated the criminal conduct." *See* T.C.A. § 40-35-113(11). The court, however, gave this mitigating factor "very little weight." With respect to enhancement factors, the court found that the defendant had a previous history of criminal convictions and appeared to find that the defendant had previously failed to comply with the conditions of a sentence involving release into the community. *See* T.C.A. § 40-35-114(1), (8). The court emphasized that the defendant's criminal history indicated that he would "not follow state law" or "[c]ourt orders." Because the trial court considered all relevant

- 14 -

principles associated with sentencing, no error attends the imposition of this within-range sentence.

With respect to the defendant's desire for probation, the court stated that the defendant had "the most convictions that" the court had ever seen "for a defendant asking for probation." Although the trial court counted 22 convictions in the defendant's criminal history, we find a total of 19 prior convictions, including two prior violations of probation, spanning nearly 25 years and beginning when the defendant was 18 years of age. The trial court also noted that the defendant had violated his probation and served 90 days in jail during the time period in which he was released on bond in the present case pending trial. The trial court further found that the defendant "either cannot comply with the order[s] of the [c]ourt or will not comply with the orders of the [c]ourt" and that, as a result, the defendant is "a threat to society." Given the defendant's lengthy criminal history and the court's concerns about the defendant's failure to comply with court orders, the trial court did not abuse its discretion by ordering a fully-incarcerative sentence.

## V. Cumulative Error

Finally, the defendant contends that the cumulative effect of the errors at trial deprived him of the right to a fair trial. Having considered each of the defendant's issues on appeal and having found nonreversible error in only one issue with no other existing errors to compound it, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## Conclusion

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE